H. B. ZACHRY, Appellant,

v.

A. L. McKOWN et al., Appellees.

No. 10685.

Court of Civil Appeals of Texas.

Austin.

July 15, 1959.

Rehearing Denied Aug. 5, 1959.

Johnson, Hite & Callender, San Antonio, for appellant.

Coleman Gay, III, Coleman Gay, Austin, for appellees.

GRAY, Justice.

Appellant sued appellees for damages for the breach of a written warranty and has appealed from a judgment rendered non obstante veredicto.

Appellant was awarded a construction contract in the performance of which a large amount of sand and gravel was required. To supply his needs for sand and gravel appellant purchased from appellees for a consideration of $750,000 all of the outstanding capital stock of Austin Sand and Gravel Company. This stock and the company were owned by appellees. The assets of this company consisted of sand and gravel leases, asphalt and sand and gravel plants together with equipment and machinery necessary for the operation of said plants.

The above purchase was by a written contract dated March 11, 1957 which provided that the sale of said stock should be closed as of March 31, 1957 and that appellant should take over the operation of the company on April 1, 1957. The contract recited:

"The corporation is the owner of and has good and merchantable title to fully equipped sand, gravel and asphalt plants, together with various good and valid sand and gravel leases, and said plants, together with all of their associated operating equipment, are in good repair."

Appellant alleged that after the purchase he discovered that the plants and their operating equipment were not in good repair as appellees had warranted them to be but on the contrary they were badly in need of repair. He alleged that necessary repairs were made by him and further alleged that the actual value of the above stock with the plants and equipment in the condition they were in was $625,000, while if they had been as warranted such actual value would have been $750,000.

A jury trial was had and in answer to three special issues submitted the jury found that: (1) the plants and their operating equipment were not in good repair on April 1, 1957; (2) that the actual value of the company stock on April 1, 1957 was $725,000 and (3) if the plants and their operating equipment had been in good repair on April 1, 1957 the actual value of the company stock would have been $750,000.

Upon the return of the verdict supra appellant filed his motion for judgment on the jury's verdict, and appellees filed their motion for judgment non obstante veredicto. Appellant's motion was overruled, appellees' was granted and a judgment was rendered that appellant take nothing by his suit.

Appellant here presents two points. These are that the trial court erred: in overruling his motion for judgment on the jury's verdict, and in sustaining appellees' motion for judgment non obstante veredicto.

Appellees present seven counterpoints. These are to the effect that there is no evidence to support the jury's answer to: issue 2; to issue 3; the condition of the equipment on April 1, 1957 was immaterial because the warranty in the contract referred to its condition on March 11, 1957; absent a finding that the decreased value of the stock was due solely to the lack of repair of the equipment the verdict of the jury affords no basis for a judgment for appellant; appellant waived any right he may have had to recover damages for breach of the warranty; the statement in the contract that the plants and equipment were in good repair was not intended by the parties to be a warranty, and appellant waived any right he may have had to recover on any ground not submitted to the jury and the judgment should be affirmed because the jury's verdict does not entitle him to a judgment.

Appellant's points are related and we will consider them in reverse order. However our statement of the evidence will necessarily be relevant to appellees' counterpoints. Further there were two sand and gravel plants conveyed by the contract supra. These are referred to as plant 1 and plant 2 but there is no complaint as to plant 1 and our consideration of the evidence will be directed to plant 2.

It is our duty to determine from the record if there is evidence of probative value to support the jury's answers, and in doing so we must consider the evidence in the light most favorable to appellant, disregard conflicts in the evidence and indulge reasonable intendments deducible from the evidence in favor of appellant and against the judgment non obstante veredicto. LeMaster v. Fort Worth Transit Co., 138 Tex. 512, 160 S.W.2d 224. McAfee v. Travis Gas Corporation, 137 Tex. 314, 153 S.W.2d 442. 3-B Tex.Jur. p. 382, sec. 914.

The evidence shows that appellant is a graduate civil engineer, that he has been engaged in construction work for many years and that he is familiar and experienced with both the machinery and the operation of plants of the kind in question here. He testified that several months before bids were to be received for the con-

struction job that he, and others, had notice of the type, nature and size of the proposed job including the approximate amount of concrete that would be required. He said that in anticipation of securing the contract that he began looking for a supply of sand and gravel sufficient to supply his needs. He said:

" * * * we had figured the job on the basis of a quotation that we had from Janes Sand and Gravel Company. That is the price we used in our bid. We also had secured some time prior to the opening of these bids leases from various property owners up and down the river on which tests showed that we had ample quantities to provide the material for the job if we should choose to produce it ourselves. So after the bids were opened and the contract was awarded to us, we used a procedure of determining whether it was to our advantage to buy the material from Janes, to set up our own plant and produce it, or to buy the plant from the McKown Brothers."

He said that in arriving at the price he agreed to pay appellees he considered and gave weight to the fact that their plant was already established.

"Time was very vital for two reasons. Number one, we have a contract completion date on all government contracts, and most private contracts. Number two, when we commit a sizable amount of equipment and a sizable part of our organization to the job, they are tied up and their expenses are part of the job cost for as long as they are on the project. If we can get them on and get them off in three-fourths of the time or half the time, we have very appreciably added to our possible profit."

He said that appellees represented to him that their plants were in good repair, that he knew that if he could start sand and gravel production immediately after be-

coming the successful bidder for the job that he could stockpile enough of it ahead that when concrete operations began the one plant could produce enough sand and gravel to maintain his schedule. He said that:

"It was my belief that Plant No. 2 could produce the total requirements of that job. The principal reason for it, Number 2 was a brand-new plant that the McKown Brothers had just set in. I had certainly of my own knowledge, by an inspection of that plant, known that it had the capacity to do the things that needed to be done to maintain the schedule; that is, the basic elements of it did. I knew that the screening capacity was ample, I knew that the washing capacity was ample, I knew that the conveyor capacity of it was ample. I knew that we would have to have certain other elements to take care of a particular tight, as we call it, specifications that the U. S. Engineers required, but these would be added elements or an extension of the same plant, and would not interfere with the production initially over the belts and through the washers, and scrubbers, that the plant itself had. * * *

"Q. Anyway, you were just relying on your own judgment when you decided that you would put out so much material with Plant No. 2?

"A. You judge the capacity of a plant by the size of its principal elements: If its screening capacity was ample for a certain production; if its washing capacity was ample for a certain production; if its conveying capacity was ample for a certain production, you would expect that the other elements were ample to take care of that; and that the motors were big enough to carry that full load as evidenced by the size of the belts thereon and the size of the other equipment; that the wire that was taken to them was big enough to carry the full load

of that; and that the dredge that would be feeding them had ample capacity to put in the full capacity of the plant; so it would be normal when somebody designed and built a new plant that all of its elements would be designed to give the maximum capacity of that plant that was available in the principal elements of that plant."

He testified to the delay caused him by the failure of the plant to operate; that the plant did not perform when it was turned on and that the load it was designated for was put on it and that "it took ninety days to get it in shape so that it would" work.

He testified as to repairs made, additional equipment installed together with the cost thereof and that the actual value of the stock purchased was $625,000 on April 1, 1957 because the plant and operating equipment were not in good repair, and that if the plant and operating equipment had been in good repair such actual value would have been $750,000.

Henry Haile, a civil engineer employed by appellant and who was experienced in construction work and with the operation and repair of machinery, testified that plant 2 did not start operating April 1 because it needed work on it. His description of the plant was:

"Plant 2, as it was at that time, was a sand and gravel plant that fed or took its material to be processed by way of a dredge, this dredge being a floating platform with a large pump and power units to drive that pump, the material to come through a pipe line to be injected into the plant at the top, to be processed by gravity and by belts through the plant, that material to be separated for size and to be cleaned with the use of water and the oversize material to be crushed down through two crushers. That material then, the sand, which went in one direction, was to be processed through a classifier which classified the sand for size again, these various classifications being blended together to make a composite sand to meet specification requirements. Some of the sand then would be excess to the use in that gradation and would be returned to the pit source or the river. The coarse aggregate then would be graded to size and separated on conveyor belts and stockpiled immediately over tunnels. These tunnels then would allow that material when needed to be drawn down and carried to what we call a secondary plant for loading out to our customers."

Haile testified as to the damaged condition of electrical wiring and other operating equipment, as to the repairs that were made and that the cost of repairs on plant 2 and the dredge was $16,656.66. He also said there were twenty-five or thirty electrical motors at the plant, that when one part of the plant stopped it was necessary to shut the rest down and testified to delays "that occurred off and on for quite a good length of time." He also testified to cost of repairs made on equipment in excess of $20,000 and that all repairs were reasonable and necessary.

Lewis Green, a mechanic, testified as to repairs made on machinery.

Appellee, O. B. McKown, was asked and testified:

"Q. Mr. McKown, Mr. Callender has asked you whether or not you considered the price that you received for the stock to be the actual value of the stock, and I believe you answered 'Yes' to that? A. Yes.

\*     \*     \*     \*     \*     \*

"Q. Are you taking into consideration the condition of repair of the plant and the various items of equipment at the time of the sale? A. Certainly.

"Q. And is that still your opinion as to the reasonable value of that stock? A. That's right.

"Q. Did you ever make any representation to Mr. Zachry, or to Mr.

Kerr, or to any of the Zachry employees or key men as to the condition of the plant? A. I believe I told Mr. Kerr and Mr. Zachry both that as far as I knew personally the plants and all equipment were in good operating condition—so far as I personally knew in my capacity.

"Q. Was that your belief at the time? A. Yes, sir."

Appellees do not complain of the jury's answer to issue one. In fact they objected to the submission of that issue because there is no controversy as to the condition of the equipment on April 1, 1957 which they say was an immaterial date.

Appellant testified (after stating his experience in the field of construction and the advantage to him of acquiring the sand and gravel plant in question) that the value of the plant in good repair was $750,000. Appellee, O. B. McKown, also said this was the actual value of the stock at the time of the sale "taking into consideration the condition of repair of the plant and the various items of equipment." The actual value of the stock is shown to be $750,000 even if it is said that appellant's and appellee McKown's testimony is in conflict as to the condition of the repair of the plant and equipment. Appellant said that the actual value of the stock, because of the condition of the plant and equipment, was $625,000. Here again if it be said that appellee McKown's testimony was that such actual value was $750,000 it presented a conflict in the testimony which was for the jury.

In finding the actual value of the stock on April 1, 1957 the jury had the testimony of the witness Haile as to loss of time in operating the plant, the condition of the equipment and the cost of repairs together with appellant's testimony that the actual value was $625,000. The jury found such value was $725,000. This finding was within the limits of the testimony and it was the jury's province and privilege to se-

lect a sum as the actual value of the stock which to them was just. Adams v. Cohn, Tex.Civ.App., 28 S.W. 909, 910. There the court said: "Scarcely a verdict in cases where the amount is in controversy could be approved if the jury was bound down to taking the precise sum sworn to by some witness." This holding is approved and followed in State v. Littlefield, Tex.Civ. App., 147 S.W.2d 270. Er. dism., j.c.

The jury's answers to issues 1, 2 and 3 find support in the evidence, they are not contrary to the conclusive evidence and cannot be ignored. LeMaster v. Fort Worth Transit Co., supra.

What has been said shows that there was evidence to support the jury's answers to issues 2 and 3 for which reason appellees' counterpoints one and two are overruled.

Appellees by their counterpoint three say that the condition of the equipment on April 1, 1957 was immaterial because any warranty in the contract referred to the condition of the equipment on March 11, 1957. We do not agree. As above stated the sale of the stock was, by the terms of the contract, to be closed as of March 31, 1957 and that:

"The Buyer shall take over the operation of Austin Sand and Gravel Company on April 1, 1957, and shall thereupon execute the notes above mentioned for the deferred portion of the consideration and from and after said date he shall have full and complete control of said corporation."

An examination of the contract shows that there was a sale of fully equipped sand and gravel plants together with all their associated operating equipment—in good repair. The purpose of the plants and their associated operating equipment was the production of sand and gravel and the clause that the same "are in good repair" means the plants and equipment were in such a state of repair as to produce the products they were designed to produce, and their operation was to be

taken over by appellant on April 1, 1957. It appears clear to us that the provison of the contract as to the good repair of the plants and their operating equipment relates to the time of the taking over of their operation by appellant and cannot be limited to March 11, 1957, the date of the contract. We think the intention of the parties is reflected by the terms and subject matter of the contract as well as its purpose to apply the good repair clause to the plants and their equipment on April 1, 1957. This intention controls the construction of the contract. Southern Travelers' Ass'n v. Wright, Tex.Com.App., 34 S.W.2d 823. Appellees and appellant were all experienced in the production of sand and gravel, they therefore knew the requirements of plants and equipment used for such purpose. This being true it would be strange for them to make a contract as to the condition of plants and equipment without reference to the time it was to be operated by appellant.

Appellees say the jury's verdict affords no basis for a judgment because there is no finding that the decreased value of the stock was due solely to the lack of repair of equipment.

Appellant testified that because the plants and operating equipment were not in good repair that the actual value of the stock was $625,000. The jury found such value of $725,000. The controlling issue was the actual value of the stock.

The trial court instructed the jury to answer issue 2 if in answer to 'issue 1 they had found that the plants together with the associated operating equipment "were not in good repair."

Appellees objected to the submission of issue 2

" * * * because there is no evidence as to the actual value of the capital stock of Austin Sand and Gravel Company on any date and particularly on April 1, 1957, and because the evidence is insufficient to support any find-ing as to the actual value of said stock on April 1, 1957, or on any other date.

"Defendants further object and except to said Special Issue No. 2 because there is no pleading to support the submission of such issue, and because the pleading is insufficient to justify its submission; and defendants further except to said Special Issue No. 2 for the reason that the date inquired about is immaterial and regardless of the jury's finding with regard to the value of said stock on said date, the plaintiff would not be entitled to a judgment herein."

Appellant alleged that:

" * * * the actual value of the stock—because of the condition of the plants and their associated operating equipment as they actually existed at the time of the sale rather than being in the condition as warranted—was Six Hundred Twenty-five Thousand Dollars ($625,000.00), * * *"

■ Under both the pleadings and the evidence the issue of actual value of the stock on April 1, 1957 was raised. Appellant's testimony clearly states the cause of the depreciated value and we think issue 2 as submitted meets appellees' objection. Under Rule 279, Texas Rules of Civil Procedure, this was a controlling issue.

In their brief of this point (4) appellees say:

"If appellees warranted anything it was the good repair of the plants and equipment, not the value of the stock to a buyer in the open market and not the peculiar value of the stock to one having the contract for the Bergstrom job. The measure of damages for breach of warranty of repair of goods is the difference between the value of the goods as warranted and their actual value. Thus, the relevant valuations are of the plants and equipment, their

worth if as warranted and as presented."

Appellant purchased the stock for an agreed $750,000. The jury found this was the actual value of the stock if the plants and equipment had been in good repair. They found they were not in good repair and that because of this the actual value of the stock was $725,000. Appellant's measure of damage was the difference between the agreed value and the actual value. Otis Elevator Co. v. Cook, Tex.Civ. App., 219 S.W. 546, Er. dism. It is evident that the trial court, the jury and the parties considered the value of the stock to be the value of the plants and the operating equipment. The jury found a difference of value for the stock as contracted for and as received by appellant of $25,000. Under such finding appellant was accountable for such value as the stock had— $625,000. Gutta Percha & Rubber Mfg. Co. v. City of Cleburne, 102 Tex. 36, 112 S.W. 1047. Alba-Malakoff Lignite Co. v. Hercules Powder Sales Co., Tex.Com. App., 235 S.W. 547. And see: 37–B Tex. Jur., Sec. 423, p. 89 where it is said that:

"The ordinary measure of damages for the breach of a warranty of the kind or quality of goods is the difference between the contract price and the value of the goods as delivered, * * *"

Appellees say that as a matter of law appellant waived any right he may have had to recover damages.

In 10–A Tex.Jur., Sec. 280, p. 567, it is said:

"A waiver, as applied to contracts and agreements relinquishing rights, is the intentional relinquishment of a known right. It exists only where one with full knowledge of a material fact does or forbears to do something inconsistent with the existence of the right or of an intention to rely upon it."

Since appellees asserted the waiver they had the burden of proving it. Futrell v. Martin, Tex.Civ.App., 40 S.W.2d 946. Appellees failed to discharge this burden. They failed to show intent on appellant's part to waive any right he had. At most the evidence shows that appellant inspected the property and concluded it was adequate to meet his needs by reason of its capacity. This would not constitute a waiver of the warranty. 37–A Tex.Jur., Sec. 150, p. 323.

In 12 Am.Jur., Sec. 390, p. 968, it is said:

"Where there has been a material breach which does not indicate an intention to repudiate the remainder of the contract, the injured party has a genuine election either of continuing performance or of ceasing to perform Any act indicating an intent to continue will operate as a conclusive election, not indeed depriving him of a right of action for the breach which has already taken place, but depriving him of any excuse for ceasing performance on his own part."

The evidence shows that appellant undertook repairs and performance of the contract and waiver is not shown.

Appellees say that the statement in the contract that the plants and equipment were in good repair was not intended by the par ties to be a warranty. In support of this contention they quote the testimony of appellee, Arthur Lee McKown, as to a dismantled tractor. He said:

"* * * I took Mr. Zachry, I took Mr. Kerr on two occasions, we went all around the equipment, and I pointed out the tractor to them; it was visual there; anyone could see it; a baby could see it. I explained to them that that was under construction, the engine was at Wm. K. Holt Company, and we had been doing work at various times on it as our men would get idle; and we told them whatever the bill was,

we would either pay it or they could deduct it."

As to this tractor the witness Haile testified:

" * * * people from McKown & Sons reassembled that tractor, and I think that took two or three weeks.

"Q. What happened after it was reassembled? A. The engine was in pretty good shape, but all the track assembly was completely worn out and the transmission.

"Q. Do you know the amount of the estimated cost of repairing that tractor?

\* \* \* \* \* \*

"Q. Do you know the amount that was necessary to put that tractor in good repair? A. Yes, sir.

"Q. What was that? A. I think that was $6,500.

"Q. After you have looked, do you know? A. Yes, sir.

"Q. Was it $6,500? A. Yes, sir."

Appellee McKown's testimony when construed with the warranty implied that the tractor would be placed in good repair. If Haile's testimony is accepted it was not so repaired. Moreover the condition of the tractor as testified to by McKown would not defeat the effect of the warranty. 37–A Tex. Jur., Sec. 150, p. 323.

■ The evidence shows that appellees knew appellant had been awarded the construction contract and his purpose in purchasing the plants and equipment and also that time was an important element. Such facts would be evidence of the intentions and purpose of the parties in making the contract. However we see no ambiguity in the contract or in the warranty and the court's duty is merely to declare its legal effect. 37–A Tex.Jur., p. 234, Sec. 96.

■ The parties voluntarily entered into the contract and neither claim accident, fraud or mistake. Therefore they are bound by the contract as it is written—with the warranty in it. Here, even in the absence of an express warranty, the law would imply a warranty that the plants and their equipment would do the work which it is ordinarily intended that they should do and appellant could recover damages for defects present at the time of his purchase. White, Ward & Erwin v. Hager, 112 Tex. 516, 248 S.W. 319.

■ Appellees' point seven is to the effect that appellant waived any right to recover on any ground not submitted to the jury and because the verdict rendered does not entitle him to a judgment the trial court's judgment must be affirmed.

The first statement of the point is correct. Rule 279, supra.

Appellees appear to contend that appellant's suit is for damages for the plants and their operating equipment not being in good repair while the jury found the value of the stock only. We need not dwell on the question further than to quote from appellant's petition one of his alternative pleas:

"In the alternative, Plaintiff alleges that the value of the stock at the time of the sale by Defendants to Plaintiff was Six Hundred Twenty-five Thousand Dollars ($625,000.00) whereas the stock would have been worth Seven Hundred Fifty Thousand Dollars ($750,000.00) provided the plants and their associated operating equipment had been as warranted by reason of which Plaintiff suffered damages in the sum of One Hundred Twenty-five Thousand Dollars ($125,000.00)."

Supra we have set out the jury's findings and have said such findings are supported by the evidence. Those findings are that: the plants and equipment were not in good repair on April 1, 1957; that the actual value of the stock on April 1, 1957 was $725,000, and that if the plants and equipment had been in good repair the actual

value of the stock would have been $750,-000. Thus the jury found that appellant received goods with an actual value of $25,000 less than the actual value of the goods he contracted to receive. Under the pleadings before us it is not material whether we apply the value to the stock purchased or to the plants and equipment received. Appellant then is entitled to recover the difference between the contract price and the value of the goods delivered whether stock or plants and equipment. 37–B Tex.Jur., p. 89, Sec. 423.

It is our opinion that the trial court erred in sustaining appellees' motion for judgment non obstante veredicto, in overruling appellant's motion for judgment on the jury's verdict and that appellees' points do not require a remand of the cause. These conclusions require that we here render judgment on the jury's verdict. Crow v. City of San Antonio, Tex., 301 S.W.2d 628.

The judgment of the trial court is reversed and judgment is here rendered that appellant recover of appellees $25,000, interest and costs.