## DUNNING v. THOMAS.

In an action against the owner of a house by a mechanic who did some of the work in the building of it, it appeared that the contract for the building was made with other parties; that, some changes becoming necessary, plaintiff was consulted as to what he would charge for them, and an agreement for making them at such prices was indorsed on the original contract and signed by the original contractors, defendant saying to plaintiff that he would put it into the contract. Defendant also testified that he told plaintiff explicitly that he would not contract with him, but only with the original contractors. *Held*, that there was no contract between plaintiff and defendant, and the action could not be maintained.

*Appeal from County Court, Larimer County.*

THE facts are stated in the opinion.

Messrs. HAYNES, DUNNING and ANNIS, for appellant.

Mr. E. A. BALLARD, for appellee.

MACON, C. This suit was originally instituted before a justice of the peace of Larimer county, by appellee, Thomas, against appellant, Dunning, to recover the sum of $100 for work alleged to have been done for Dunning on a certain brick house, in the town of Fort Collins, in the summer and fall of 1882, on two special contracts made between the parties,—the one on the 18th of July, and the other on August 2, 1882, by the first of which Dunning was to pay Thomas $235, and by the second $75, for certain brick work to be done upon Dunning's house. There were no written pleadings in the case, but Dunning denied at the trial that he had ever made any contract with Thomas to do any work, or that he had ever agreed to pay him for anything he might do on said house. The evidence is clear and uncontradicted that on the 13th of July, 1882, Dunning made a written agreement with Schooley and Shortridge for the rebuilding of the same house on which Thomas worked,

and for which he now claims a right of action against Dunning. By that written agreement the price for the work of rebuilding was fixed at $1,025. This article of agreement was signed by Schooley and Shortridge on the one part, and Dunning on the other. On the 18th of July a change was made in the house, as it was to be rebuilt under the original contract of July 13th, which increased the expense $304.25. This agreement as to the alteration was indorsed on the original contract, and signed by Schooley and Shortridge. Again, on August 2d, a further change was made in the building. It involved a further cost of $75, which was also indorsed on the original, and signed by Schooley and Shortridge. The building was then completed, and during the progress of the work payments were made from time to time by Dunning to Schooley and Shortridge, until early in September, 1882, Dunning paid. Schooley and Shortridge the whole of what was due them under these several contracts above stated, except $150 retained to meet a lien filed by Smith and Soult. The whole amount paid by Dunning to Schooley and Shortridge and Smith and Soult, under these agreements, was $1,404.25. After the payment to Schooley and Shortridge of this amount, Thomas called on Schooley and Shortridge for payment of what he claimed to be due him for his work upon said building; and, a disagreement arising between him and them as to the amount due him, he called on Dunning to inquire what he (Dunning) understood were the prices to be paid for the work specified in the two contracts of July 18th and August 2d, and whether satisfied or dissatisfied with Dunning's answer we know not; but a few days thereafter he sued Dunning for $100, the same sum which was in controversy between him and Schooley and Shortridge. In the trial in the county court, Thomas proceeded upon the sole ground that he had contracted for the work he did on Dunning's house with Dunning alone, and not

with Schooley and Shortridge, and, failing to get his pay from them, he fell back upon Dunning as his primary pay-master, and looked to him for payment, though he would have been content had Schooley and Shortridge paid him.

The only point in this case, as we view it, is, Did Dunning contract directly with Thomas for the work which the latter performed on Dunning's house, or was the contract made by Dunning with Schooley and Shortridge, and did Thomas work under them as an employee or subcontractor for them? If Dunning did hire Thomas to do the work, then he must pay him; but if he contracted with Schooley and Shortridge only, and Thomas did his work for Schooley and Shortridge, then there was no privity between Dunning and Thomas, and the latter must look to Schooley and Shortridge for his wages, and not to Dunning. Whether such contract was made between Dunning and Thomas must depend upon the evidence in the case, and in discussing this question we shall rely entirely upon the testimony of Thomas, and the uncontradicted testimony of Dunning and Schooley. In his testimony, Thomas says "that he went to see Dunning on July 18th, and agreed with him as to the cost of the change in the original plan of the house to be rebuilt; that he supposed Dunning was going to put it in writing; that Dunning said: 'I will put this in the contract.' He had some other items, among others something for glass, and he said he would put it all into the contract. I said: 'I do not know why this should go into the contract. I have nothing to do with that; but I do not care so long as I get my pay.' He went to writing, and I went off." It is not denied that Thomas knew that the contract Dunning alluded to was that of July 13th. Thomas knew this fact, and hence the remark: "I do not know why this should go into the contract. I have nothing to do with that; but I do not care so long

as I get my pay." Dunning did not ask Thomas to sign this additional agreement, but required Schooley and Shortridge to do so, and they complied. The same may be said of the second alteration of August 2d.

Leaving out of sight the positive declaration of Dunning that he would not contract for this work with any one except Schooley and Shortridge, and looking at the case upon the statements of Thomas alone, it is unquestionable that Dunning did not intend to enter into any engagement with Thomas, and that the latter so understood, or should have done so. An agreement is a meeting or accord of two or more minds as to a particular thing; and, if one sought to be held as agreeing dissents in the ordinary language of business intercourse, it is an absurdity to say he did agree merely because the other party insists he did not understand the language. It seems impossible to doubt that Thomas understood perfectly that Dunning did not intend to contract with him from the conversation between them detailed by Thomas, and we cannot comprehend how one can compel another to enter into contractual relations with him when that other refuses so to do.

If now we look to the testimony of Dunning and Schooley, which is uncontradicted, we find a stronger confirmation of the views above expressed. Dunning says he told Thomas plainly and unequivocally on the 18th of July, when the first change in the original contract was suggested and made, that he would not contract with any other persons than Schooley and Shortridge; and this was said in answer to Thomas' declaration that he did not see what he had to do with the contract between Dunning and Schooley and Shortridge of the 13th of July. Dunning's exact language is this: "Thomas' bill was $125 too much, I thought. He figured finally to do the work that much less. The glazier's bill had been obtained. After Thomas agreed to do the work at price

named, I added the three bills, viz., the carpenter's, mason's and glazier's, together. They came to $304.25. I started to put it into the contract with Schooley and Shortridge. Thomas demurred, saying he did not see what he had to do with that. I said I would only have my contract with one party; have it in writing, and then try and live up to it; that I did not propose to have contracts with several. Thomas said: 'Well, as long as I get my pay, I don't care.' I then reduced the understanding to writing, which is on back of contract under date of July 18th. Then read it over in presence of Schooley and Thomas. It being satisfactory, I signed and Schooley signed. Then Thomas and Schooley left the office." As to the second alteration, Dunning says: "Second change was entirely in brick. Schooley and Shortridge were to have Thomas' figure, and tell how much. He came to me saying they so instructed him, and it came to $197. I refused to pay such price. Change had to be made. Tried to get figures of others. In a week, Markham said he would do it for $65, but was busy. I told Schooley I would pay $75 to have the work proceed. Thomas came to my office; said Schooley had thus informed him, and he would go ahead. Schooley came to my office that day. I reduced this second change to writing, and he signed it with his name and Shortridge's." Schooley's testimony is to the same effect as to Dunning's refusal to contract with Thomas, and as to the contracts for the alterations being made between Dunning and himself and Shortridge.

Upon this state of facts it is obvious that no contractual relations existed between Dunning and Thomas, and that the county court misconceived the law arising out of the transactions detailed, in holding that Dunning was liable to Thomas by virtue of a contract between them. In this view of the law, it is unnecessary to discuss the weight of the conflicting evidence so strongly insisted upon by counsel for appellant.

We think the county court erred, that the error was material, and that the judgment should be reversed.

STALLCUP and RISING, CC., concur.

PER CURIAM. For the reasons assigned in the foregoing opinion the judgment is reversed and the cause remanded.

*Reversed.*