470 P.2d 870 (1970)
SUMMIT CONSTRUCTION COMPANY and St. Paul Fire and Marine Insurance Company, Plaintiffs in Error,
v.
YEAGER GARDEN ACRES, INC., Defendant in Error.
No. 70-009. (Supreme Court No. 22402.)
Colorado Court of Appeals, Div. I.
March 17, 1970.
Rehearing Denied April 2, 1970.
Certiorari Denied June 11, 1970.
*871 Weller, Friedrich & Hickisch, H. Gayle Weller, John R. Hickisch, Denver, for plaintiffs in error.
Harden & Wyatt, Ralph B. Harden, Fort Collins, for defendant in error.
Selected for Official Publication.
SILVERSTEIN, Chief Judge.
This case was originally filed in the Supreme Court of the State of Colorado and subsequently transferred to the Court of Appeals under authority vested in the Supreme Court.
This is an action for damages for breach of contract, brought by defendant in error, hereinafter called plaintiff or Yeager, Inc., against plaintiffs in error, hereinafter called defendants or Summit and St. Paul Ins. Co.
The contractual agreement between Yeager, Inc. and Summit consists of three documents; a contract for the construction of a shopping center, dated November 2, *872 1961 (Exhibit A); an addendum thereto (Exhibit C), undated, but stating, "this shall be a full and complete understanding as of June 18, 1962;" and an agreement (Exhibit G) dated October 3, 1962.
Exhibit A is a contract for the construction of a shopping center by Summit, as principal contractor, for Yeager, Inc. on land owned by Yeager, Inc. The contract is a Standard Form of Agreement issued by The American Institute of Architects and provides, inter alia, that the building would be built according to drawings and specifications prepared by C. Clay Davis, an architect employed by Summit, and that plans and specifications of W. T. Grant Co. and National Tea Co. (tenants in the building) shall be part of the contract.
As the construction progressed numerous differences arose between the parties and Exhibit C was executed. It states that the parties, "desire to settle any and all claims, counter claims, adjustments, charges and work orders to this date." (June 18, 1962) The contract then sets forth several specific changes to the original contract after stating, "such amendments being made without prejudice to or in any way affecting the bond and contract of November 2, 1961." Exhibit C further provides, "That the Contractor shall proceed to complete the building in accordance with plans and specifications as stated in the contract of November 2, 1961, said plans as amended by the plans dated June 18, 1962, and signed by the parties hereto ."
The project was substantially completed by October 3, 1962, at which time there still remained disputes between the parties. The parties again desiring "to settle and determine all outstanding disputes," executed Exhibit G whereby Yeager, Inc. agreed to pay an agreed sum to Summit and Summit agreed to perform various specified acts and stated, "That the Contractor does hereby represent and warrant to the Owner that the project has been completed in accordance with the plans and specifications approved by W. T. Grant Company and Miller Super Markets (National Tea Co.), ." The agreement then states, "[E]ach of the parties does hereby, irrevocably, release the other, of and from all claims, demands and damages of every kind and character except for the specific undertakings herein made the obligation of the Contractor."
St. Paul Ins. Co. executed a contract bond (Exhibit B) on the project. Its only defense to the action is that it is released from liability to the extent that the principal, Summit, may have been released by the execution of Exhibits C and G. This is correct. If the principal is released by the obligee so is its surety. 50 Am.Jur. 987 (Suretyship § 126)
Two basic issues are raised by Summit:
1. The execution of Exhibits C and G settled all disputes then existing between the parties and released Summit from all liability from all deficiencies (if any) then existing and known to Yeager, Inc., including those alleged in the complaint.
2. Even if Summit was not released, the project was completed in compliance with the terms of the contract.
In addition both parties assert that the trial court erred in its assessment of damages.
As to the first issue, we agree with the findings of the trial court and hold that the execution of Exhibits C and G did not release Summit (or its surety, St. Paul Ins. Co.) from its obligation to complete the project in accordance with the plans and specifications as provided in the contract. The problem as to which plans and specifications controlled will be discussed later.
Exhibit C sets forth many specific items of dispute and claims of both parties. One of the claims of Yeager, Inc. was, "for failure to complete in accordance with the plans and specifications in the amount of Three Thousand Dollars ($3000.00)." As stated above by this addendum, the Contractor agreed to complete the building according to the plans signed by Yeager, *873 Inc. It is undisputed that the job was not completed when Exhibit C was signed and the obligation to complete remained with Summit.
Exhibit G was executed after the project was purportedly completed. In this agreement Summit agreed to perform certain acts, warranted the completion of the project as above set forth and was paid $84,000.00 by the owner, Yeager, Inc. Summit now asserts that it is not liable on its warranty because other covenants in the same agreement release it and because Yeager, Inc. knew or should have known that the representation of warranty was not true when made.
Neither of these claims has merit. In order to settle the dispute each party agreed to perform certain acts and undertook obligations. One of the obligations of Summit was the warranty of completion. The release which has been quoted above specifically excepts the undertakings of the Contractor, including the warranty. The construction asserted by Summit would render the warranty meaningless and surplusage. Written instruments must be construed, if possible, to give effect to all of their provisions. Century Refining Co. v. Hall, 10 Cir., 316 F.2d 15, Grimes v. Barndollar, 58 Colo. 421, 148 P. 256.
The evidence discloses that the full extent of the asserted deviations from the plans and specifications was not discovered until after Exhibit G was signed. This was exactly the possibility that Yeager, Inc. desired to protect itself against in requiring the warranty. Although some cases hold that an express warranty does not survive acceptance with knowledge of defects, Harrist v. Spencer-Harris Tool Co., 244 Miss. 84, 140 So.2d 558, the more recent cases hold that a, "seller may bind himself against patent defects, if the warranty is so worded." Zachry v. McKown, Tex.Civ.App., 326 S.W.2d 227, Williston on Contracts, 3rd Edition, § 972, Vol. 8, P. 497.
Since Summit was not released the next question to be determined is whether or not Summit breached the contract by failing to complete the project in accordance with the plans and specifications. A careful reading of the pertinent exhibits establishes that the plans and specifications which control are those prepared by C. Clay Davis and approved by W. T. Grant Co. and Miller Super Markets (National Tea Co.).
At the trial seven sets of specifications and ten sets of plans were admitted in evidence. None of them was approved in writing by either Grant or Miller. The evidence does disclose, however, that the specifications of Grant and Miller referred to in Exhibit A, the original contract, were merely guide lines to be followed by the architect in preparing the plans and specifications under which the building would be constructed. The architect's work would be submitted to Grant and Miller who would then approve or disapprove. The lease between Grant and Yeager, Inc. was admitted in evidence and provides that if Grant failed either to approve or object in writing to the working drawings (plans) and specifications within thirty days, such failure would constitute approval.
Further the evidence established that as the work progressed, the architect would submit specific plans and specifications to the field representatives of Grant and Miller who were present on the job site periodically, obtain oral approval and thereafter the work would proceed. In the particulars pertinent here the requirements of Grant were stricter than those of Miller and apparently if Grant was satisfied, so was Miller. It is apparent from all of the evidence that the specifications designated Exhibit "ZZ" and the plans designated Exhibit "YY" best meet the requirements of being prepared by C. Clay Davis and approved by Grant and Miller.
Did Summit complete the project according to the plans and specifications? The trial court found that the building failed to meet the requirements of the plans and specifications in the following particulars: the roof, the concrete flooring, *874 expansion joints, the store fronts and one door. It found that as to other matters complained of the specifications were met. We concur generally with these findings. However we base our findings as hereinafter set forth solely on failure to comply with the provisions of Exhibits "YY" and "ZZ". The guideline specifications of Grant and Miller, relied on in part by the trial court, in our opinion, were superseded by Exhibit "ZZ" and should not be considered.
A. The roof: The specifications (ZZ) provide, "5.04-20 year tar and gravel built up roof shall be applied over the roof deck in an approved manner as recommended by the manufacturer. Roofing shall be laid in accordance to Barrett Anchorbond roof #520-C."
"1.03All work shall be done by skilled mechanics and in accordance with the best standard practices and of first class quality and workmanship."
The plans (YY) on sheet ten show a "dead level" roof. As constructed the roof was admittedly only a fifteen year roof. There was disputed testimony as to whether or not one of the officers of Yeager, Inc. had consented orally to this reduction. The trial court found that he had not. This was clearly within its discretion and is controlling here, Whatley v. Wood, 157 Colo. 552, 404 P.2d 537.
There was considerable evidence which established that the roof did not drain and that after storms there were many puddles of water on the roof. The preliminary specifications provided for roof drainage. However the final plans called for a dead level roof and the final specifications, quoted above, made no provision for drainage. The evidence was uncontroverted that all dead level roofs will puddle.
The trial court in detailed findings of fact found that the roof failed to meet the plans and specifications in the following particulars.
1. The roof was a fifteen year roof and not a twenty year roof.
2. The expansion joints in the roof were not installed as provided at page 9 of the plans (YY) and as required in section 1.03 of the specifications (ZZ) which reads, "vertical and horizontal expansion joints shall be provided in accordance with the best standard practice."
3. Roof joists were not constructed as shown at Sections AA and CC on sheet 14 of the plans. (YY)
We concur with the above findings. However we hold the trial court erred in finding that the failure of the roof to drain constituted a deviation from the plans and specifications.
B. The floor: The specifications (ZZ) provide: "Floors 3.09 all floors on grade shall be concrete, at least 4" thick, reinforced with steel wire mesh and laid on well tamped, level base at least 4" thick of crushed stone or gravel.
3.10 concrete floors, used as a wearing surface, shall be steel trowelled to a level and true surface."
The plans (YY) on page 12 show wire mesh to be installed in the upper half of the concrete.
Based on ample evidence the trial court found that the floor was not constructed according to these specifications in any particular and stated:
"The core testing of the floor and the section of the floor, 4 feet by 32 feet, taken up in the northwest portion of the building revealed that the concrete was not as thick as required by the specifications, that no crushed stone or gravel was installed under the floor, and that the wire mesh was not properly imbedded in the concrete. The testimony of all witnesses relative to the floor was the floors are not true and level to a significant extent."
C. Expansion Joints: The evidence showed, and the trial court found, that expansion joints were not installed as provided at pages 3 and 9 in the plans (YY) or in accordance with the best standard *875 practice as required by the specifications (ZZ).
We concur with these findings.
The trial court found minor deficiencies in a store front and one door and awarded damages in the sums of $224.13 and $273.00 for these items. We concur in these findings and in the damages awarded.
The trial court assessed damages for the deficiencies in the roof at $7,437.50 and for those in the floor at $7,070.50, but awarded no damages relative to the expansion joints. It is our opinion that the court erred in its measure of damages as to these three items.
In its conclusions of law the trial court cited Campbell v. Koin, 154 Colo. 425, 391 P.2d 365 (1965) and quoted from page 430, 391 P.2d page 367 as follows:
"Our decisions have not been too clear on the measurement of damages in substantial performance cases. In some of the cases, the contract price is diminished by the amount necessary to compensate for the deficiency. (Citing cases) In other cases the owner may recover the cost or expense of putting the work in the condition called for by the contract. (Citing cases)
Permitting the recovery of the cost or expense of putting the work in the condition called for by the contract is a workable rule and should be applied except in those cases where its application would involve `unreasonable economic waste.'
If it is made to appear that physical reconstruction and completion in accordance with the contract will involve unreasonable economic waste by destruction of usable property or otherwise, the damages awarded for the contractor's breach of contract will be measured by the difference between the market value that the structure contracted for would have had and that of the imperfect structure received by the plaintiff."
The trial court then stated that the quoted measure of damages applied to this case. We agree. However the trial court did not apply this measure in assessing damages relative to the expansion joints, the roof or the floor. As to these three items the testimony is clear, as found by the trial court, that the replacement of the roof and floor would "involve unreasonable economic waste." Therefore under the authority of Campbell v. Koin, supra, the measure of damages for these items is, "the difference between the market value that the structure contracted for would have had and that of the imperfect structure received by plaintiff." (Emphasis supplied)
No evidence was introduced by either party relative to the market value of the structure. Confronted with this state of the evidence the trial court computed the damage partly on cost of repair and partly on a percentage of the cost of the roof and floor. This was error.
Where, as here, part of the deficiencies can be repaired at reasonable cost and part cannot, the cost of repair can be assessed as the measure of damages to the former and the difference in market value can be used as to the latter. J. G. Jansen, Inc. v. Rilling, et al, 203 Wis. 193, 232 N. W. 887 (1930).
Yeager, Inc. asserts error in the trial court's failure to award damages for engineering and architectural costs incurred in investigating the deficiencies in the construction. However the trial court awarded costs to the plaintiff for the services of its experts in testifying as to these matters. Its assessment of their reasonable worth was within its discretion and will not be disturbed here. Leadville Water Co. v. Parkville Water District, 164 Colo. 362, 436 P.2d 659 (1967). The costs as assessed by the trial court are affirmed. The court did not err in refusing to award damages to plaintiff for these items.
However we find the trial court erred,
1. In finding that the failure of the roof to drain constituted a deviation from *876 the plans and specifications and awarding damage therefor;
2. In assessing damages for the deficiencies in the roof and the floor partly on a percentage of the cost and partly on the cost of repair;
3. In failing to assess any damages for failure properly to install expansion joints.
The cause is remanded for a new trial solely on the issue of damages measured by the difference, if any, between the market value of the structure with the deficiencies in the expansion joints, roof, and concrete floor hereinabove set forth and the market value which the structure would have had if it had been completed in accordance with the plans, Exhibit YY, and the specifications, Exhibit ZZ.
In all other respects the judgment is affirmed.
ENOCH and PIERCE, JJ., concur.