**BA MORTGAGE COMPANY, INC., a Delaware Corporation, Plaintiff,**

v.

**UNISAL DEVELOPMENT, INC., a Wisconsin Corporation, Defendant.**

Civ. A. No. 75-W-1287.

United States District Court, D. Colorado.

May 7, 1979.

Cir. 1978). Nevertheless, it is the Court's firm conclusion based upon all the evidence adduced herein that this patent is valid and deserving of judicial enforcement.

Gorsuch, Kirgis, Campbell, Walker & Grover by John S. Pfeiffer and Stephen Klein, Denver, Colo., for plaintiff.

Wood, Ris & Hames by William K. Ris, Denver, Colo., for defendant.

## MEMORANDUM OPINION

WINNER, Chief Judge.

After long pretrial skirmishing, and to almost the date of trial, plaintiff asserted both a contract claim and a fraud claim against defendant. Just before trial, the fraud claim was dismissed by plaintiff's trial counsel who had just entered their appearance. In fairness to defendant, there was not a scintilla of evidence of fraud in this case, and I have never before had occasion to try a case in which I was so convinced that experienced businessmen testifying on both sides of a case were testifying to their honest beliefs as to what had been agreed upon, albeit those beliefs were diametric. As always, when reckless charges of fraud are made, discussions ended with the filing of the complaint, and a bitter lawsuit which might have been avoided ensued.

The case is almost unbelievable when the amount of money involved is compared with the haste in which the underlying deal was entered into. There was a cash-out-of-pocket loan of $2,100,000.00, and plaintiff wants damages of $3,390,374.00, but, although there were pages and pages of boilerplate typed up to be hurriedly signed by the parties, there was never any meaningful discussion between representatives of the contracting companies concerning their supposed agreement, although both plaintiff and defendant are experienced in the lending business. Plaintiff, a Delaware corporation, is a wholly owned subsidiary of Bank of America, and defendant, a Wisconsin corporation, is no pygmy in the lending business, but both jumped into this transaction without any real analysis of the crucial agreement, and that's what makes for lawsuits.

The facts leading up to the parting of ways are all too familiar to Colorado natives. People from out of the state think that every mountain in Colorado is destined to be another Aspen or another Vail, and the seasonal nature of most mountain resorts is overlooked. Here, Jack Butz, a Tulsa architect, joined by Charles Burris, a Tulsa developer, decided that a Ramada Inn should be built in Estes Park, Colorado, and they ignored the sad fact of life that there is almost no fall, winter or spring season in Estes Park. Butz was the owner, architect and contractor of the job, and these triple roles eliminated the checks and balances governing most construction jobs. Burris was pretty much a silent partner, and all aspects of the project were under the control of Butz. Defendant's interest in financing the building was brought about by Butz acting through Wiggins, a loan broker, and the two of them obtained an appraisal of the proposed project. The appraisal was made by one Speckman, an MAI, and with the aid of hindsight, it can be said with certainty that he erroneously appraised the worth of the completed building at $2,278,000, to justify the desired loan for $2,100,000. The appraisal was mostly keyed to an income approach, and it greatly overestimated off-season demands for rooms. The Speckman appraisal was sent along to Unisal, and defendant indicated a willingness to make a $2.1 million loan subject to 17 conditions. Butz was also trying other sources to obtain the loan, and ultimately BA Mortgage made a construction loan commitment for the $2.1 million. It is evident that plaintiff too relied on the Speckman appraisal, and, in arranging for the takeout agreement which is the basis for this lawsuit, BA knew that Unisal was relying on the appraisal and on the claim of Butz and Burris that they had a net worth of $6-million or $7-million, which, of course, they didn't have. Although plaintiff questioned the validity of the Speckman appraisal, and although plaintiff knew Unisal

was relying on it, no hint was given to Unisal as to plaintiff's concerns.

Plaintiff structured the transaction to have Chicago Title Insurance Company act under the Colorado Disbursing Statute [C.R.S. '73 § 38–22–126.] BA's construction loan agreement was to make $2.1 million available with interest at 3% above prime and with the building to be ready for occupancy by December 15, 1974. In an agreement which referred to BA as "the company", it was said that "this commitment shall be null and void if its conditions have not been met and the first disbursement is not made on or before January 15, 1974, unless such date is extended by the company at its sole option." [This extension, everyone admits, was entirely at the option of the lender, but as we shall see presently, when the shoe is on the other foot, BA says that extension of the agreement for a takeout loan should be at the option of the borrower.] Originally, the loan was to be secured by all furniture and equipment, but by an amendment to the commitment not disclosed to Unisal, BA Mortgage and Butz agreed that the furniture and equipment could be leased by the owner, an agreement which substantially lessened the security which would support the permanent loan.

January 31, 1974, counsel for plaintiff prepared a "Buy-Sell Agreement" which was an agreement between owner, plaintiff and defendant, and which incorporated numerous exhibits, including the construction loan agreement with its amendment, the original Unisal letter to Wiggins with an amendment, the note, security agreement, financing statements and many more related documents. The Buy-Sell Agreement made provision for effective incorporation by reference of an agreement called the "Building Loan Agreement", but the "Building Loan Agreement" omitted any reference to the fact that Butz was acting as owner-architect-contractor, a novel situation of conflict of interest known to BA Mortgage and not disclosed to Unisal.

As originally contemplated by Unisal, the loan was to be a typical mortgage loan, and it was BA Mortgage which structured the transaction to have Unisal agree to stand by for a possible takeout to be accomplished by a purchase of a note made payable to BA Mortgage—a note which on its face gave the borrower every incentive to seek financing somewhere else and which permitted the borrower to do just that. Absolutely no penalty was imposed on the borrower if he obtained more favorable financing, and, had the deal been a good one, the borrower could have walked away from Unisal which had to stand ready to make the loan during the takeout agreement's term, and I suppose that this would be true during an extended term.

The mass of paper was prepared by the Colorado lawyer for BA Mortgage, and it was only at the last minute that Unisal had a Colorado lawyer look over the documents to "approve them as to form." Before I come to the confusion of paragraph 3 of the Buy-Sell Agreement which is the paragraph on which the parties so enthusiastically disagree, mention should be made of internal contradictions in the numerous boilerplate agreements counsel for BA Mortgage submitted. The loan agreement made no provision for extension of time, but the whole case revolves around the meaning of paragraph 3 of the Buy-Sell Agreement which supposedly provides for extensions of time. There was no provision for an extension of the completion date in any agreement; the promissory note required payment of interest through December 1, 1974, and it required that principal payments start on January 1, 1975. The Buy-Sell Agreement was by its terms tied to the Construction Loan Agreement, and defendant's obligations were conditioned upon there being no default under the note or security documents. [If there was no proper completion, default followed as night follows day.] As I shall discuss presently, the lawsuit boils itself down to a question of whether paragraph 3 of the Buy-Sell Agreement gave the borrower a unilateral option to extend the commitment, but if this be the meaning of that paragraph, there are multitudinous other internal contradictions which I do not take time to discuss.

The borrowers' option to buy the land expired on January 1, 1973, and, as that date approached, time pressures increased.

It was only a few days before the time closing of the land purchase had to be accomplished that the Buy-Sell Agreement and its many exhibits were mailed to Unisal. After making one correction in the name of the borrower, paragraph 3 of the Buy-Sell Agreement was interlineated, and the interlineation was made between two semicolons, one of which was a typographical error, but perhaps the stenographic mistake was prescient. I am about to quote paragraph 3 of the Buy-Sell Agreement with the interlineated material in script to indicate the handwritten material, but to show the two semicolons before the pen and ink interlineation, paragraph 3 as originally typed read:

"3. *Extension Purchase Date* —Permanent Lender hereby agrees that if completion of construction is delayed or hindered by reason of strikes, lockouts, weather, acts of God, riots, insurrection or war, Permanent Lender will extend the date for such completion and the date for the purchase of the Promissory Note for the period of the delay not to exceed six months;; and further agrees that said completion and purchase date may be extended in any event for successive periods of six months upon payment to Permanent Lender for an extension fee of $21,-000 for each such six-month extension."

Interlineated, and with the use of "will" and "may" highlighted by capitalization, the agreement as signed was changed to read:

"3. *Extension Purchase Date* —Permanent Lender hereby agrees that if completion of construction is delayed or hindered by reason of strikes, lockouts, weather, acts of God, riots, insurrection or war, Permanent Lender WILL extend the date for such completion and the date for the purchase of the Promissory Note for the period of the delay not to exceed six months; *upon receipt of extention (sic) fee of $21,000.00 ___*; and further agrees that said completion and purchase date MAY be extended in any event for successive periods of six months upon payment to Permanent Lender of an extension fee of $21,000.00 for each six-month extension."

There was absolutely no discussion among the parties as to the reasons for and the meaning of the interlineation, and the documents were signed with the added language without comment. Construction started, and the inevitable happened. Butz tried to supervise the building of a motel in Estes Park, Colorado, from his office in Tulsa, Oklahoma. He didn't understand construction problems in a mountain resort community with its floating, unreliable labor supply trying to work with sporadic deliveries of materials. The job was plagued with shortages, delays and shoddy workmanship, and, long after it was apparent the motel was months behind schedule, and just five days before the December 15, 1974, deadline, Butz tendered $21,000.00 to Unisal with his request for a six-month extension. No one claims that the requested extension should have been granted because of "unavoidable delay", and all agree that the extension was requested in accordance with whatever the second part of paragraph 3 means.

Unisal responded immediately by mailgram dated December 16, 1974, "Under the provisions of Paragraph 3 of Buy and Sell Agreement we have elected not to extend the commitment. We consider our commitment terminated as of December 15, 1974. Letter to follow." A letter did follow, and the tendered $21,000.00 check was returned. This lawsuit was commenced shortly thereafter.

In most cases, one side says an agreement is ambiguous and the other side says that it isn't. One side usually says parol evidence is needed to interpret the agreement, and the other says the agreement is not subject to explanation. This case differs from the norm in that BA Mortgage says that as any fool can plainly see, the option for a six-month extension was a right to be exercised by the borrower, but Unisal says that no one possessed of his senses could read the agreement to give the extension option to anyone other than the lender. Both sides argue rules of construction applied under Colorado law, and everyone agrees that Colorado law does govern. Each side says that under accepted rules of construction, the

other side loses. I make no pretense of covering each and every argument advanced in the long and able pretrial briefs, trial briefs and post-trial briefs, but I try to mention the principal contentions of the parties, and I mention a few of the authorities cited. In some instances, both sides rely on the same authority, but they read the case differently.

Both sides argue that with the interlineation, the agreement is meaningless unless it is read to reach either (a) the result desired by plaintiff, or (b) the result desired by defendant. It just depends on who is doing the reading. Plaintiff argues that before the interlineation, no payment was required for an extension brought about by force majeure, and that "unless the final clause of numbered paragraph 3 of the Buy and Sell Agreement is construed so as to give the borrowers a right to an extension conditioned upon the payment of $21,000, then it must be regarded as nothing more than a waste of paper and type." Defendant counters by saying that under plaintiff's interpretation, "the 'unavoidable delay' clause would be rendered mere surplusage. No reason would ever exist to exercise the 'unavoidable delay extension,' if the 'six months extension' were automatically to be avoided. Plaintiff's interpretation is therefore to be avoided." All of which is to say,

"'When I use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what I choose it to mean—neither more nor less.'

"'The question is,' said Alice, 'whether you can make words mean so many different things.'

"'The question is,' said Humpty Dumpty, 'which is to be master—that's all.'"

Depending upon which side's reading one wants to adopt,

"'Contrariwise,' continued Tweedledee, 'if it was so, it might be; and if it were so, it would be, but as it isn't, it ain't. That's logic.'"

Plaintiff says that defendant's reading of the agreement makes the last part of the paragraph surplusage, and defendant says that plaintiff's reading makes the first part of the paragraph surplusage, but plaintiff and defendant both cheerfully say that there is no ambiguity. Reading the "before" and "after" interlineation versions of paragraph 3, it seems clear that the "before" language granted a force majeure extension without cost, and the "after version" said that there would be a $21,000.00 charge assessed for such an extension. That was the testimony as to the reason for the interlineation. I confess that if the intent was simply to charge for the force majeure extension, clearer language could have been selected, but, taking into account the time pressures which existed when the paperwork was sent to Unisal, taking into account that all of the papers had been prepared by BA Mortgage and taking into account that the change almost had to be by way of interlineation rather than by redrafting, I think that the most logical reading of the agreement is that a $21,000.00 payment gave the borrower a contractual right to a six months extension if required by force majeure, but that any extension requested because of reasons other than force majeure gave the lender the option to extend upon payment of the $21,000.00. (Happily, I am not faced with a situation in which the lender said it would extend upon payment of $42,000.00, because I recognize the availability of an argument the agreement could be read to give the lender the option to extend, but the cost of the extension was frozen.) If the agreement is not ambiguous, I think it should be read to give the borrower a mandatory force majeure extension and to let the lender decide if it wanted to extend for non-force majeure reasons.

However, I concede that the agreement is fairly susceptible to either the reading given it by plaintiff or the reading given it by defendant, and I think that many rules of construction should be considered, coupled with parol testimony, in deciding this case. The difficulty is that some rules of construction and some testimony support plaintiff's conclusion and some support defendant's. Both sides argue the rule that a contract should be read to give every sentence meaning, and this is surely the law.

*P.U.C. v. City of Durango, (1970) 171 Colo. 553, 469 P.2d 131, Ramsay v. Nordloh, (1960) 143 Colo. 526, 354 P.2d 513, Summit Construction Company v. Yeager Garden Acres, Inc., (1970) 28 Colo.App. 110, 470 P.2d 870,* and a host of other cases. Plaintiff and defendant apply this same rule to arrive at opposite results, and the inevitable conclusion is that in final analysis each side says that either the first or the last part of the paragraph should be read out of the agreement. I don't think that either plaintiff or defendant can derive much solace from this rule of construction, because the argument is a two way street, and it is self-defeating.

Predictably, defendant lays great stress on the use of the words "will" and "may." Plaintiff concedes that ordinarily the word "will" is a word of command, while the word "may" grants a discretionary right. Plaintiff rests much of its argument on *Carleno Coal Company v. Ramsay Coal Company (1954) 129 Colo. 393, 270 P.2d 755,* but, because of other language in it, defendant likes the case too. I think that the language excerpted from the case by plaintiff is a trifle too selective to give fair meaning to the holding of the Colorado Supreme Court, and I do not read it the same way BA Mortgage does.

The parties there signed a contract making plaintiff defendant's distributor of coal. The contract provided for termination on "60 days written notice of claim of default and intention to cancel the contract specifying the particular breach it is claimed has been made and thereupon, unless such breach has actually existed, cancel and terminate the contract." Defendant notified plaintiff in writing that the contract was cancelled, but "defendant made no showing that any sixty day notice was given to plaintiff." The trial court upheld the cancellation and held that the contract could be cancelled for breach without affording opportunity to the distributor to cure the breach. As stated by the Colorado Supreme Court, the question was:

> "Where parties enter into an agency contract, for a specific period of time, with a reservation that it could be cancelled before the expiration of that period by a sixty-day default notice, which must specifically set forth the default claimed, and permit the party claimed against sixty days within which to cure the default, can the contract be terminated for alleged failure of performance without giving the sixty-day notice of intention to end the agreement?

> "The question is answered in the negative. It is argued by counsel for defendant that the provision for the sixty day notice is not mandatory in that it contains the clause '. . . the party not in default *may* give to the defaulting party 60 days written notice . . . .' Whether the word 'may', as used in this clause of the contract shall be construed as imposing a mandatory duty upon the parties must be determined from the whole agreement, and the manifest intention of the parties as expressed therein must govern. It is always true that use of the word 'may' imposes only a permissive right or procedure. It has been held that this word, when considered with the subject matter of a statute, means 'must' or 'shall.' [citations omitted] Generally, the rules applicable to the construction of constitutional provisions, statutes and contracts are the same. [citation omitted]. From paragraph 9 of the contract in the instant case it is clear that the parties intended to make exclusive provision for the termination of the agreement prior to the expiration date fixed by the instrument. To hold that use of the word 'may' created no rights or duties, and that it amounted to no more than a permissive or optional procedure would be to give no meaning whatever to an entire paragraph of the contract, and to interpret it as mere surplusage. Where, by reasonable construction of a clause in a contract, the words employed can be given effect, it is our duty to thus construe the words used. It is presumed that each part of the contract has a purpose, and a construction which gives legal effect to every part thereof will be adopted. [citation omitted]. Certainly the parties intended to accomplish something by the considered language employed. The in-

tention to cover the field of cancellation for default of either party is clear, and this means that the sixty-day notice of intention to terminate is mandatory, notwithstanding the use of the word 'may.' By the use of that word in the contract before us, the employer has given the option to serve the sixty-day notice if it considered the default of sufficient consequence to terminate the contract. If it elected not to give such notice then the default was waived."

Full analysis of *Carleno* doesn't result in the conclusion plaintiff says is inevitable, because our paragraph 3 isn't fairly comparable. There is no question of waiver of a right to terminate involved in this case; the question is did the borrower have a right to demand an extension or did the lender have the option to grant an extension. *Carleno* had to do with a requirement that the employer perform a condition precedent to the right to terminate. Our takeout agreement has to do with an expiration by the agreement's own terms unless it is extended. Not involved in the *Carleno* decision was paragraph 9 of the agency agreement, "This agreement shall continue for 5 years from the date hereof, and for a further period of 5 years, at the option of seller, if seller gives producer written notice of intention to exercise such option at least 90 days prior to the expiration of the first period." That's the part of the agreement which could be fairly compared with paragraph 3 of the Buy-Sell Agreement, and the portion of the *Carleno* contract creating during the term of the agreement a termination right subject to a right to cure a default is not to be fairly compared with paragraph 3 of our Buy-Sell Agreement.

Plaintiff next argues that a contract should be construed to favor the party it was designed to protect, and I agree that this is the law. *Christmas v. Cooley, (1965) 158 Colo. 297, 406 P.2d 333.* With unfailing aim, plaintiff says the provision was intended to protect plaintiff, but the evidence just as easily supports the opposite conclusion. The evidence established to my satisfaction that the party to be protected was the takeout lender who was required to keep a couple of million dollars on hand for use by the borrower if he decided to make claim for the takeout loan. [Remember, there was no requirement that the borrower had to use Unisal's money if a better loan could be located elsewhere.] I think that one party to be protected was the takeout lender, and, at the very worst, it can't be said that only the borrower had any chips in the game. Read the way plaintiff wants to read paragraph 3, Unisal was required to hold $2.1-million in perpetuity upon payment to it of $42,000 per year. Unless my arithmetic is wrong, that's 2% compared with today's prime rate of about 10%. Even counsel for BA Mortgage conceded at time of trial that the claimed option to extend didn't run forever, but I have yet to hear what, under plaintiff's view, would trigger the cutoff of the alleged right to indefinite extensions.

Plaintiff acknowledges that contracts are to be construed against the party who prepares them, but plaintiff says that although its lawyer prepared all of the documents, the rule doesn't count because Unisal made the pen and ink interlineation. I don't think that the interlineation created the uncertainty, and I don't think it lets plaintiff escape the rule of construction. As originally drafted, paragraph 3 said that "completion and purchase date *may* be extended in any event for successive periods of six months upon payment to Permanent Lender of an extension fee of $21,000 for each six-month extension." The lawyer for BA Mortgage who drafted the agreement is the one who selected the words which create the problem, and I think that the rule of construction works against plaintiff.

Defendant argues the rule that contracts must be construed in accordance with generally accepted meanings of the words used and that the contract's construction must bring about a reasonable result. *Radiology Professional Corp. v. Trinidad Area Health Association, Inc., (1978) Colo., 577 P.2d 748, Sunshine v. M. R. Mansfield Realty, Inc., (1978) Colo., 575 P.2d 847.* I think that this is the rule, and, taking into account the absurdity of a contract which gives someone an indefinite right to keep money avail-

able at an annual cost of 2%, I think that the only reasonable construction of paragraph 3 is that Unisal had the option to extend for non-force majeure causes, but it had the obligation to extend where force majeure occurred.

Another thing perhaps worth considering is that study of paragraph 3 shows that "Permanent Lender" is mentioned twice, but "Borrower" isn't mentioned at all. If Borrower was to have the option, one would think that the lawyer for BA Mortgage would at least mention his name or his capacity.

■ It is settled that in construing a contract, reference should be made to ancillary agreements to try for a harmonious construction. *Harty v. Hoerner, (1969) 170 Colo. 506, 463 P.2d 313, Fuller and Co. v. Mountain States Investment Builders, (1975) 37 Colo.App. 201, 546 P.2d 977.* The construction urged by plaintiff would create conflict between the Buy-Sell Agreement on the one hand and the Building and Loan Agreement and the note on the other. By its terms, the Building and Loan Agreement ran out on December 15, 1974, and the Borrower was given no right to seek an extension. The promissory note required that principal payments be commenced January 1, 1975, and there is no provision for an extension of this time. It is not sensible to say that the time to make the takeout loan could be extended at Borrower's request, but payments on principal of the takeout loan would be required before the loan was made. Moreover, the Building and Loan Agreement in paragraphs 2 and 3 changes the effect of the note given BA Mortgage by the Borrower, and it says that any provision in the note to the contrary notwithstanding, everything by that time advanced "shall be due and payable on December 15, 1974." If paragraph 3 of the Buy-Sell Agreement be read the way plaintiff wants to read it, the Borrower's rights to an extension would be illusory under the requirements of paragraphs 2 and 3 of the Buy-Sell Agreement.

There was expert testimony in the case as to customs and practices in the lending industry, but I didn't find it to be very helpful because all experts agreed that each takeout loan agreement stands on its own feet. However, all the expert witnesses agreed that a takeout lender has to hold funds available to accomplish a takeout for only a reasonable period of time, and plaintiff's expert said that the agreement couldn't mean an extension in perpetuity. However, he encountered the same dilemma faced by plaintiff's counsel, and he made no suggestion as to how many extensions the borrower could request under plaintiff's interpretation of the agreement nor as to how the alleged right to an extension ran out or how it could be cut off.

■ One final rule of construction I shall mention which is to me perhaps the most important in this case. That is the rule that a contemporaneous construction by a party contrary to the position taken in the lawsuit is binding. *George Tritch Hardware Co. v. Donovan, (1923) 74 Colo. 350, 221 P. 881.* Applying this rule, plaintiff is twice hoist on the rule's petard. On October 30, 1974, Edward Emrich, BA's vice-president wrote Unisal saying that he hoped that the borrower wouldn't find it necessary "*to request* an extension" of the takeout agreement. To be consistent with plaintiff's position at trial, he should have, but he didn't, say that he hoped it wouldn't be necessary for the borrower to exercise any *right to demand* an extension. [See, Exhibit NN] A little more than a month later, December 2, 1974, Mr. Emrich wrote Unisal's general manager saying, "You [Unisal] also *indicated a willingness to extend* your commitment upon receipt of the extension fee described therein, if the borrower so elects." A recognition that a "willingness" on Unisal's part is a prerequisite to any extension flies in the teeth of the present claim that Unisal had no choice and that it was required to grant the extension. Thus, the late 1974 contract interpretation by BA Mortgage was identical with the contract interpretation of Unisal's two lawyers who advised Unisal that it didn't have to extend and it was identical with Unisal's interpretation throughout this lawsuit.

■ If, indeed, the contract is one which must be interpreted, I interpret it to mean that the option to grant the six-month extension of the loan agreement was Unisal's option and that the borrower had no right to demand or to insist upon an extension if supported by a tender of $21,000,00. The matter is not free from doubt, but, on balance, taking into account the testimony in the case and the rules of construction ordinarily applied in construing written agreements, I find that at least Unisal thought in good faith that the agreement was one giving it the right to consent to or to refuse an extension of the takeout agreement and that under all of the facts and circumstances of the case and usual rules of construction BA Mortgage should be held to this meaning of the agreement. That being so, I find and conclude that there was no breach of the agreement by Unisal.

I repeat that which I said at the outset of this case. "I have never before had occasion to try a case in which I was so convinced that experienced businessmen testifying on both sides of a case were testifying to their honest beliefs as to what had been agreed to, albeit those beliefs were diametric." I am sure that neither side thought much about paragraph 3 of the Buy-Sell Agreement or its meaning. I am equally sure that the principals of BA Mortgage assumed that the Borrower could extend the time during which Unisal would have to take out BA Mortgage, and I have the same certainty as to the beliefs of Unisal's representatives as to its rights to extend or refuse to extend the takeout time. These beliefs were held in good faith by the parties without devoting thought to any rules of construction or any absurdities which might develop from melding the several agreements. This is a case in which experienced and honest businessmen were dealing with each other, but they might as well have been contracting in a foreign language not understood by the other side, because in their haste to close a deal before the Borrower's option to buy the land ran out they just weren't communicating.

That being so, in addition to everything I have already said, plaintiff can't recover here because there was no meeting of the minds. It is hornbook law that without a meeting of the minds there can be no contract. *Dartmouth College v. Woodward, 4 Wheat 518, 4 L.Ed. 629, Patrick v. Bowman, 149 U.S. 411, 13 S.Ct. 811, 37 L.Ed. 790, Beer v. Mackin, 145 U.S. 629, 12 S.Ct. 977, 36 L.Ed. 842, Minneapolis R. Co. v. Columbus Rolling Mill, 119 U.S. 149, 7 S.Ct. 168, 30 L.Ed. 376, Louisiana v. New Orleans, 109 U.S. 285, 3 S.Ct. 211, 27 L.Ed. 936, Dunning v. Thomas, 10 Colo. 84, 14 P. 49, Lamar Milling & Elevator Co. v. Craddock, 5 Colo. App. 203, 37 P. 950, Grogan v. Travelers Ins. Co., 25 Colo.App. 517, 139 P. 1045, Wilson v. Perkins, 147 Colo. 249, 363 P.2d 492, Mile Hi Apartments v. Mr. Lucky's, (Colo. App.) 518 P.2d 854*, and the case on which plaintiff here relies, *Sunshine v. M. R. Mansfield Realty, Inc., (1978) Colo., 575 P.2d 847.* Sunshine and his wife owned real estate which they listed with Mansfield for the purpose of leasing. Mansfield found a tenant, and a deal was worked out which required that the lease be "guaranteed by the Small Business Administration", the guaranty to be obtained by the tenant. A guaranty was obtained to the extent of 80% of the lease payments, and this was all which was permitted under applicable federal statute. (15 U.S.C. § 636(a)(3)). The Sunshines tried to back out of the agreement because a 100% guarantee had not been obtained, and they said that they understood that the lease payments would be fully underwritten through the SBA guarantee. The Colorado Supreme Court recognized the rule that there must be a meeting of the minds before there can be a contract, but it held that where there is only one reasonable meaning, the parties would be held to that meaning. Justice Erickson said that with the federal statute in mind which permitted a maximum 80% guarantee, it was unreasonable to say that 100% was intended. Once more, I think that plaintiff's quotation from the case is selective, and I quote much more fully from it. The Colorado Supreme Court said:

> "Where the record establishes that the parties to a contract originally attached the same meaning to a contractual term, and a disagreement as to the meaning of

the term later arises, the trial court's determination of the provision's meaning is a finding of fact which is binding on appellate courts. However, where neither party at the time of the contract was aware that the other attached a different meaning to the contractual provision, the trial court's determination of the provision's meaning is a conclusion of law based upon its interpretation of the document's language. *Sentinel Acceptance Corp. v. Colgate, 162 Colo. 64, 424 P.2d 380 (1967); Van Diest v. Towle, 116 Colo. 204, 179 P.2d 984 (1947); Conklin v. Shaw, 67 Colo. 169, 185 P. 661 (1919).* In the latter situation, a trial court could find as a matter of fact that there had been a mutual mistake as to the provision's meaning, but it could not determine the meaning of the provision as a matter of fact, since the parties had never attached the same meaning to the provision.

"The record establishes that the Sunshines and James attached two different meanings to the guaranty's language. The Sunshines testified that they expected a 100% SBA guaranty, while James testified that he believed an 80% SBA guaranty was required. The trial court's conclusion that the lease's guaranty provision required a 100% guaranty, based upon its interpretation of the lease, is a conclusion of law not binding on an appellate court. *Sentinel Acceptance Corp. v. Colgate, supra; Van Diest v. Towle, supra; Conklin v. Shaw, supra.*

"The general rule is that when parties to a contract ascribe different meanings to a material term of a contract, the parties have not manifested mutual assent, no meeting of the minds has occurred, and there is no valid contract. *Carpenter v. Hill, 131 Colo. 553, 283 P.2d 963 (1955).* However, an exception to the general rule is observed when the meaning that either party gives to the document's language was the only reasonable meaning under the circumstances. In such cases, both parties are bound to the reasonable meaning of the contract's terms.[1]

"[1] Construction of the contractual language to sustain a contract in such cases is not tantamount to the court's creation of a contract for

the parties. The well-established and reasonable rule of construction applied in this case is a narrow exception to the general rule that a mutual mistake voids the contract.

"*1 A. Corbin, Contracts § 104 (1963); see also 1 S. Williston, Contracts § 94 (W. Jaeger 3d ed. 1957).* Moreover, the listing agreement was drafted by the Sunshines' attorney and must be construed most strictly against them. *Christmas v. Cooley, 158 Colo. 297, 406 P.2d 333 (1965).* "The Sunshines' understanding of the guaranty provision was clearly unreasonable, since a 100% SBA guaranty could not, as a matter of law, be obtained. Reference in the guaranty to the SBA necessarily incorporated and made the lease subject to the SBA's statutory restrictions as to maximum insurability. *See 4 S. Williston, Contracts § 609 (W. Jaeger 3d ed. 1957).* James was in the process of securing the maximum SBA guaranty available under the law when the Sunshines terminated the lease. We hold that James' construction of the guaranty provision under the circumstances was the only reasonable construction available.

"Since the lease did not require that James obtain a 100% SBA guaranty, the Sunshines' termination constituted 'refusal or neglect of the owner to consummate the [contract] as agreed upon.' Mansfield Realty, who procured a ready, willing, and able lessee on the terms of the listing agreement, was, therefore, entitled to its commission. Section 12–61–201, C.R.S. 1973.''

■ I think that *Sunshine v. Mansfield, supra,* is in point, but I don't think that it is supportive of plaintiff's position. This is not a case where Unisal's understanding was contrary to law; it is not a case where Unisal's understanding was unreasonable. It is a case where if there was any unreasonable understanding the unreasonableness was on the part of BA Mortgage, but I think that neither side was unreasonable and I think that both sides were in good faith in their belief as to what had been agreed to. That being so, the case falls squarely under the general rule noted by

Justice Erickson in *Sunshine v. Mansfield,* and in his words,

". . . when parties to a contract ascribe different meanings to a material term of a contract, the parties have not manifested mutual assent, no meeting of the minds has occurred, and there is no valid contract."

Since there was no valid contract, Unisal cannot be liable for breach of a non-contract, and judgment must enter in favor of defendant.

Absent a contract and absent a breach of contract, there can be no damages, but counsel have filed long and excellent briefs on the extremely complicated damage questions which would have to be decided if there were liability. I do not intend to devote much time to damage discussion, but taking counsel's efforts into account, and hoping to reduce some of my thoughts to writing should there be a reversal, I make brief mention of some of the damage problems. I mentioned early on that plaintiff asks more than $3-million in damages, but most of the damages claimed wouldn't be recoverable even if there were liability.

We start from the proposition that recoverable damages must be a proximate result of defendant's wrong, but this rule is subject to slight modification in anticipatory breach cases as to date from which they run. As to principles generally applicable, see *5 Corbin on Contracts § 1053, and Cargill, Inc. v. Stafford, (1977) 10 Cir., 553 F.2d 1222.* Here, under plaintiff's theory, defendant was required to grant a six-month extension to October 4, 1975 [the date of project completion plus 60 days], and then, if plaintiff were right, defendant would have had to come up with $2.1 million. Only foreseeable damages are recoverable and damages which plaintiff can be expected to mitigate can't be allowed. Here, the claim is that defendant breached a contract to lend money, and there is a special rule applicable to such contracts. That rule, according to the *Restatement of Contracts, § 343,* is:

"Damages for breach of a contract to lend money are measured by the cost of obtaining the use of money during the agreed period of credit, less interest at the rate provided in the contract, plus compensation for other unavoidable harm that the defendant had reason to foresee when the contract was made."

That being the rule, I don't think that the plaintiff proved the damages it could have recovered had there been a breach, and I don't think plaintiff can recover the damages it says it proved, because I don't think that they come under the rule. I don't think that operating losses can be allowed. I don't think that profits supposedly lost by a brand new business can be awarded. *Milheim v. Baxter, 46 Colo. 155, 103 P. 376.* Moreover, here, plaintiff foreclosed its mortgage and sold the property at a sheriff's sale. Plaintiff was the only bidder at a sale under which a receiver was appointed, and I am at a loss to see how the receiver's losses could be assessed. Damages must be foreseeable, but how could Unisal be held to foreseeing that a wholly owned subsidiary of Bank of America would operate a motel rather than come up with the required $2.1-million? I don't think that management fees for running the motel for BA Mortgage would be allowable, and I very much doubt the propriety of charging the foreclosure costs to one who breaches a contract to lend money. I don't agree with plaintiff's interest calculations, and my disagreement goes to rate, time and amount against which it is computed. I think that if plaintiff were to recover, interest should be 6% of $2.1-million for less than a week. I am lost by plaintiff's claim for the cost of a sewer line the need for which is in no way attributable to any failure to loan $2.1-million, and any obligation on Unisal's part to pay for furniture and fixtures is something I can't fathom. Where I really get lost in trying to follow plaintiff's damage claims is the argument that the alleged agreement was to loan $2.1-million, but plaintiff bid more than that amount at the foreclosure sale, and this fixed the fair market value of the property. 55 *Am.Jur. Mortgages, § 908.* Now, plaintiff says that the value is less than the value it irretrievably fixed by its bid. All in all, if defendant were held to have breached a contract to extend the time

during which it had to provide a takeout loan, recoverable damages would be limited to a relatively small amount. I do not take the time to winnow the damage evidence nor the testimony which showed horrible defects in the building which would have to be cured before the motel could be found to be completed—a condition precedent to any permanent loan.

This is enough to say about the extended briefs on damages, and, for the dual reasons discussed, judgment shall enter against the plaintiff and in favor of the defendant.