[No. 49191–7. En Banc. June 21, 1984.]

EASTLAKE CONSTRUCTION COMPANY, INC., *Respondent,* v. LeROY HESS, ET AL, *Petitioners.*

*Short & Cressman,* by *David R. Koopmans, Andrew W. Maron,* and *Janet Gray,* for petitioners.

*R. M. Holt* and *Ronald C. Kinsey, Jr.,* for respondent.

PEARSON, J.—Both parties to a construction contract appeal the Court of Appeals decision which increased the trial court's award of damages and affirmed the dismissal of an action under the Consumer Protection Act.

Two substantial issues are presented in this appeal. The first requires us to determine the proper measure of the owners' damages for breach of a construction contract resulting in both remediable and irremediable defects in the structure. We hold that the appropriate formulation of damages is that set forth in Restatement (Second) of Contracts § 348 (1981). Accordingly, we affirm several items of damages awarded, but remand for the trial court to apply section 348 to certain other claimed items of damages which were not allowed at trial.

The second issue is whether the trial court and Court of Appeals were correct in ruling that the inducement element of the "public interest" requirement of the Consumer Protection Act, RCW 19.86, was not met in this case. We reverse on this issue and remand for a determination of whether the "inducement" and "potential for repetition"

elements of the public interest requirement were satisfied. The remaining issues raised by Eastlake are patently without merit and will not be addressed in this opinion.

Plaintiff Eastlake Construction Company (Eastlake) brought this action in King County Superior Court to recover $13,719 allegedly owing on a construction contract. Eastlake had entered the contract with defendants LeRoy and Jean Hess to erect a 5–unit condominium building in Issaquah. Defendants counterclaimed, alleging damages for breach of the contract and violations of the Consumer Protection Act. The trial court awarded defendants damages for breach of contract, less the amount owing to Eastlake under the contract, and dismissed the Consumer Protection Act action.

Defendants are the parents of a mentally retarded 25–year–old woman. They agreed with the parents of other retarded children to build a small condominium to provide a permanent home for their children. Mr. Hess assumed responsibility for the project and located a suitable piece of property at 245 Northwest Juniper in Issaquah. The property was owned by William Carey, a social friend of defendants and a principal in Eastlake Construction Company. Carey agreed to sell the land to defendants on condition that Eastlake was awarded the contract to construct the condominiums. Plans and specifications were drawn up by Mr. J. C. Smith, an architect hired by Hess, and Eastlake submitted a price of $118,600 to construct the building in accordance with these plans and specifications. On June 27, 1977, a "Lump Sum Construction Contract" incorporating these terms was signed by defendants as owners and by Mr. Kenneth Kemp on behalf of Eastlake. The contract provided that work was to begin within 10 days and the condominium to be substantially completed within 90 working days from the start. It provided further that Eastlake was to be paid as work progressed, with 10 percent of the contract price to be withheld until 30 days after acceptance of the construction by the owner.

Construction began in June and progressed smoothly

until October. Progress payments were made to Eastlake on August 9, 1977 ($25,000); September 9, 1977 ($34,300); and October 10, 1977 ($28,880). After the October payment had been made, work ceased for 3 weeks, putting the project behind schedule. Hess subsequently determined that Eastlake had been overpaid for the work completed up to that point, and decided to withhold the November progress payment of $16,380. Eastlake refused to do any further work on the project until it received the additional progress payment, and construction ceased completely.

The dispute continued until January, when, according to Hess's testimony, Carey informed him that the project was completed and that Eastlake intended to sue if not paid the balance owing on the contract. On January 14, 1978, at Hess's request, the architect, Smith, inspected the project and issued a written report. The report detailed work still to be completed, work to be corrected, and work not in compliance with the specifications. On January 25, 1978, Hess met with the principals of Eastlake. At this meeting, according to Hess, Eastlake agreed to complete construction by February 8, 1978, and Hess agreed as a sign of good faith to pay Eastlake a further $16,781 on the contract price. Subsequently, Hess paid Eastlake the agreed sum and Eastlake performed some further construction work. By the end of February, however, construction had not been completed to Hess's satisfaction.

Accordingly, Hess undertook to complete the construction himself, assisted by two carpenters. His itemized costs for completing the project total $7,979.80. A certificate of occupancy for the condominiums was issued by the City of Issaquah on May 31, 1978.

On July 14, 1978, Eastlake filed suit seeking $13,719 allegedly owing on the construction contract. Defendants counterclaimed, alleging that Eastlake had breached the contract and had violated the Consumer Protection Act.

The nonjury trial began on June 9, 1980. It was not disputed at trial that Eastlake had not been paid $13,719 of the contract price of $118,600. The principal factual dispute

centered around the nature and extent of Eastlake's breaches of the contract and the measure of damages for those breaches. The trial court heard considerable testimony that Eastlake had delayed completion of the project, had failed to complete the work contracted for, and had performed work and used materials not in accordance with the contract specifications. The trial court found that Eastlake had breached the construction contract in a number of respects. These findings, and the damages allowed by the trial court, may be summarized as follows.

A. Breaches for which the trial court allowed damages.

1. Eastlake wrongfully abandoned the project in February 1978, and defendants were allowed the reasonable cost of completing construction to make the condominiums habitable, $7,979.80.

2. Defendants were allowed the reasonable rental value of the condominiums from the time construction should have been completed until the actual completion date, $4,262.50.

3. Defendants were allowed damages for the reasonable cost of work specified in the plans, but not completed by Eastlake: insulating waste pipes, $807.44; installing recirculating fans, $1,031.10.

4. Defendants were allowed damages for the reasonable cost of repairing and replacing work performed by Eastlake which did not conform to the specifications: repairing the roof, $4,414.01; replacing balcony guardrails, $1,580.76; repairing and replacing washer and dryer closets, $751.84; replacing nonvented kitchen hood fans, $926.53; and replacing interior doors, $787.22.

5. Defendants were also allowed $75 for installation of cable television and $200 for light fixture underrun.

6. Defendants were also allowed damages for the installation of kitchen cabinets not in accordance with contract specifications.

The court declined to award the cost of replacement of these cabinets because this would constitute unreasonable economic waste. Instead, the measure of damages was the difference between the value of the specified cabinets

($8,725.50) and the cost of the cabinets actually installed ($3,700): $5,025.50.

B. Breaches for which the trial court allowed no damages.

The trial court found that Eastlake had breached the construction contract in a number of other respects, but that these breaches "did not result in substantial damage to the building nor result in a substantial loss of value to the building". Defendants were not allowed damages for these breaches.

The trial court found that Eastlake departed from the specifications as follows:

1. Installation of 1–inch foam insulation under the concrete floors, rather than 1½ inches.

2. Installation of plastic rather than cast iron waste lines.

3. Installation of electrical service panels in the bedrooms rather than the hallways.

4. Installation of the wrong grade of felt under the siding.

5. Use of insufficient caulking materials and exterior stain.

6. Installation of galvanized roof jacks rather than lead roof jacks.

7. Installation of acoustic ceiling materials rather than orange peel texture.

8. Installation of one piece of insulation in a party wall instead of two pieces.

9. Installation of blown–in rock wool rather than fiberglass batts for ceiling insulation.

In making these findings, the trial court rejected the testimony of a real estate appraiser. This witness testified that the value of the condominiums as constructed by Eastlake was $23,000 per unit, and that the value if constructed according to contract specifications would have been $39,000 per unit. The trial court found the witness' testimony unpersuasive because he used two different and incompatible methods of valuation to arrive at the two figures.

The trial court found a total of $27,841.70 in damages to defendants, against which was offset the $13,719 owing on

the construction contract, for an award on the counterclaim of $14,122.70.

Defendants presented an offer of proof in support of their claim that Eastlake's breach of the construction contract violated the Consumer Protection Act. Defendants offered to produce five witnesses who would testify to untimely, erratic, inadequate, and defective performance by Eastlake of construction contracts, and of dozens of violations of building ordinances.

The first witness, Marvel Booth, would testify that Eastlake had contracted to construct a building for her. Eastlake broke promises to begin construction immediately and to provide a performance bond. When construction finally began, it proceeded erratically, and Ms. Booth terminated the contract, arranging for completion of the project by another builder. Eastlake's work was found to be inadequate and incomplete. Defects included inadequate roof supports and beams, studs out of plumb, improperly constructed footings, and use of substandard lumber. Ms. Booth had considerable difficulty in meeting with Eastlake's principals, who broke numerous promises to arrange meetings. Eastlake's conduct delayed completion of the building 1 year and substantially increased costs.

The second witness, James Rozanski, would testify that Eastlake attempted to build on three lots in Issaquah without complying with restrictive covenants attached to the lots. The matter was not resolved until Rozanski obtained an injunction to prevent further construction.

The next witness, James Krause, would testify that he had contracted with Eastlake for construction of a house on a lot owned by Eastlake. Construction had not begun several months after the agreed date, and Krause learned that Eastlake had sold the lot he had selected. He brought a lawsuit against Eastlake, and was able to recover his lot and have his house constructed on it by another company.

The fourth witness, Michael Little, would testify that he entered a contract with Eastlake for construction of a house. The contract provided that construction was to be

completed by November 1977. Six months after that date, in May 1978, Eastlake informed Little that construction was completed. Little determined that the house was not complete, refused to accept it, and sued to compel Eastlake to perform the contract. The work was completed in August 1978. Interest rates had risen almost 10 percent over the 9 months for which construction was delayed, substantially increasing Little's costs.

The final witness, Michael Dykeman, a King County building inspector, would testify to dozens of violations by Eastlake of the King County building ordinances. These violations included 38 failures to obtain foundation inspections prior to pouring foundations, approximately 38 failures to obtain building permits prior to beginning construction, and 34 failures to obtain a final inspection and certificate of occupancy before permitting owners to occupy newly constructed homes. The King County Prosecutor had initiated actions to enjoin further violations by Eastlake and to impose criminal penalties for past violations.

The trial court declined the offer of proof, ruling that the Consumer Protection Act did not apply because there was no public interest involved in the contract between Eastlake and defendants.

Both parties appealed from the trial court's decision. The Court of Appeals rejected Eastlake's arguments that defendants were not real parties in interest, therefore not entitled to maintain the counterclaim; that Hess had waived any unexcused delay and departures from the specifications; and that the trial court had erred in admitting certain evidence. The Court of Appeals upheld the trial court's measuring damages by the cost of remedying defects.

On the cross appeal, the Court of Appeals increased the damages awarded by the trial court. First, it concluded that the issue of economic waste was a question of law, and that the trial court had erred in concluding that replacing the kitchen cabinets would constitute economic waste. Accord-

ingly, the Court of Appeals allowed the cost of removing the existing cabinets ($4,060) plus the cost of the cabinets specified ($8,725.50), thus increasing the trial court's award by $7,760. Second, the Court of Appeals allowed damages for the cost of replacing some of the materials which did not conform to specifications: textured ceiling, $3,754.16; party walls, $1,488.27; ceiling insulation, $3,013.99; and exterior stain, $1,677.43. The court concluded that correction of these defects would not constitute unreasonable economic waste and that therefore the trial court erred in not awarding damages. Finally, the Court of Appeals affirmed the dismissal of the Consumer Protection Act claim. Both parties appeal from this decision.

We turn now to consider the first issue before us—the appropriate measure of damages. In its petition for review, Eastlake raises two objections to the Court of Appeals resolution of the damages issues. First, Eastlake contends that the Court of Appeals improperly applied the "cost of remedying defects" measure of damages to a contract which had not been substantially performed. Second, Eastlake contends that the Court of Appeals improperly concluded as a matter of law that replacement of nonconforming materials did not constitute unreasonable economic waste. Both of these matters require consideration of the general principles applying to the measure of damages in construction contract cases.

The general measure of damages for breach of contract is that the injured party is entitled (1) to recovery of all damages that accrue naturally from the breach, and (2) to be put into as good a pecuniary position as he would have had if the contract had been performed. *Diedrick v. School Dist. 81,* 87 Wn.2d 598, 610, 555 P.2d 825 (1976). In the case of construction contracts, special problems have been encountered in putting the injured party in the pecuniary position he would have enjoyed had the contract been properly performed by the builder. These special problems have led to the creation of special rules for measuring damages in such cases.

The genesis of these rules in this state is *White v. Mitchell,* 123 Wash. 630, 213 P. 10 (1923). This case established two different measures of damages for breach of a construction contract. The appropriate measure of damages in a particular case depends upon whether there had been "substantial performance" of the contract.

The court said in 123 Wash. at 637 that there

> is a substantial performance of a contract to construct a building where the variations from the specifications or contract are inadvertent and unimportant and may be remedied at relatively small expense and without material change of the building . . .

In such a case, the measure of damages is the cost of completing the structure as contemplated by the contract.

On the other hand, there is not substantial performance of the contract where, in order to make the building comply with the contract, the structure in whole or material part must be changed, or there will be damage to parts of the building, or the expense of repair will be great. Where the contract has not been substantially performed, the measure of damages is the difference between the value of the building as constructed and the value had it been constructed in accordance with the contract.

The rules enunciated in *White v. Mitchell* have been applied in numerous cases. In *Kenney v. Abraham,* 199 Wash. 167, 90 P.2d 713 (1939), for instance, this court held that the construction contract had not been substantially performed where the contractor, in violation of the contract, had constructed a house on foundations placed on loosely filled ground. The measure of damages was therefore the "difference in value". In *Bernbaum v. Hodges,* 43 Wn.2d 503, 261 P.2d 968 (1953), the court determined that there had been substantial performance of the contract where a building had been constructed with heating equipment which did not conform to the contract specifications, floors which had settled unevenly, walls which leaked, and asphalt paving which had cracked. The court reasoned that there had been substantial performance because it was not

"'necessary to tear down and rebuild large portions of the structure'". 43 Wn.2d at 508, quoting *Mahan v. Springer,* 155 Wash. 98, 99, 283 P. 667 (1930). Therefore, the cost of repairs was the appropriate measure of damages.

The next significant decision in the development of the rules governing this issue appears to be *Forrester v. Craddock,* 51 Wn.2d 315, 317 P.2d 1077 (1957). In that case, there were numerous breaches of the contract specifications, the most serious of which were cracks in the foundations. The trial court concluded that the contract had not been substantially performed and that the value of the house was $3,500 less than it would have been if constructed in accordance with the contract. Of this impairment of value, $2,600 was attributable to the cracks in the foundations. The trial court also found that the cost of repairing the other defects was $1,443.75. It awarded the owners of the building $4,043.75: $2,600 for loss of value for the defective foundations (which were presumably irremediable), and $1,443.75 for the cost of repairing the other defects. This court reversed, holding that:

> Having determined that appellants had not substantially performed their contract, it was error for the trial court to award respondents a sum greater than $3,500, the amount found to be the difference between the value of the building as constructed and its value had it been constructed in accordance with the contract.

51 Wn.2d at 322.

All of the cases discussed thus far cite *White v. Mitchell, supra,* or cases decided thereunder as the source of the rules governing the measure of damages. A different approach was taken in more recent cases. In *Baldwin v. Alberti,* 58 Wn.2d 243, 362 P.2d 258 (1961), the court applied Restatement of Contracts § 346 (1932) to determine the appropriate measure of damages. This rule provides that if completion or repair of the construction does not involve "unreasonable economic waste" the measure of damages is the cost of completion or repair. Section 346(1)(a)(i). If completion or repair would involve unrea-

sonable economic waste, the measure of damages is the difference in value. Section 346(1)(a)(ii). Applying this rule to the facts before it, this court said:

> In the instant case, the evidence discloses, and the trial court found, that the defects could be "adequately and reasonably" repaired. In other words, the court found that the defendant substantially performed the contract and that the defects could be repaired without unreasonable economic waste; hence, our disposition of this case is controlled by the rationale of 1 Restatement, Contracts, § 346 (a)(i) . . .

58 Wn.2d at 246. In this way, unreasonable economic waste came to be combined with substantial performance as part of the formula by which the appropriate measure of damages is determined.

The nature of unreasonable economic waste was considered in more detail in *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 442 P.2d 621 (1968), a case involving the defective construction of an ice rink. The defects could be remedied only by tearing out the base of the rink and replacing it. This court applied *Baldwin v. Alberti, supra,* to determine the appropriate measure of damages. The issue turned upon whether demolition and reconstruction of the ice rink constituted unreasonable economic waste. The court quoted extensively from Professor Corbin in considering this issue. Part of the quoted passage is as follows:

> It is true that the phrase "unreasonable economic waste" is no more definite and certain in its meaning and application than is the phrase "substantial performance." It too raises a question of fact. Whether the "economic waste" involved in any specific tearing down and rebuilding is "unreasonable" cannot be resolved by the application of any rule of law; prevailing practices and opinions (the mores) of men, involving their emotions as well as reason and logic, must be taken into account.

5 A. Corbin, *Contracts* § 1089, at 492 (1964), *quoted in Prier,* 74 Wn.2d at 30.

In *Prier,* this court decided that, although the cost of reconstruction was great, it did not amount to unreasonable

economic waste. No remedy other than reconstruction was available to protect the very foundations of the building housing the ice rink; indeed, neither party had urged the application of the unreasonable economic waste measure of damages. 74 Wn.2d at 31.

The most recent decision of this court dealing with this issue, *Fuller v. Rosinski,* 79 Wn.2d 719, 488 P.2d 1061 (1971), stated that the question of damages in cases of this type is governed by Restatement of Contracts § 346 (1932). This court determined in *Fuller* that the contract had not been substantially performed. This conclusion was based on the trial court's finding that "it would cost more than the contract price to remedy the defects". 79 Wn.2d at 723. Therefore, this court held the appropriate measure of damages was not the cost of repair but the difference in value.

The principal issue in all of these cases, as in the present case, is which of the two measures of damages should be applied. The touchstone of the earlier decisions was substantial performance. This term has received only the vaguest of definitions. *White v. Mitchell,* 123 Wash. 630, 213 P. 10 (1923) indicates that substantial performance is determined by the nature of the defects and the difficulty and expense of correcting them. In *Bernbaum v. Hodges,* 43 Wn.2d 503, 261 P.2d 968 (1953), the critical fact indicating substantial performance was that repair of the defects would not require rebuilding large portions of the structure. *Forrester v. Craddock,* 51 Wn.2d 315, 317 P.2d 1077 (1957) accepted without analysis the trial court's conclusion that there had been substantial performance.

Nevertheless, although the concept of substantial performance remained somewhat vague in these cases, the operation of the rule remained reasonably straightforward. It was complicated substantially, however, by cases which, without rejecting the notion of substantial performance, began applying alongside it the Restatement concept of unreasonable economic waste. It is not made explicit in any opinion how the two concepts relate. The cases appear, however, to treat substantial performance and unreasonable

economic waste as interchangeable labels denoting the same thing. *Fuller v. Rosinski,* 79 Wn.2d 719, 488 P.2d 1061 (1971); *Prier v. Refrigeration Eng'g Co.,* 74 Wn.2d 25, 442 P.2d 621 (1968); *Baldwin v. Alberti,* 58 Wn.2d 243, 362 P.2d 258 (1961). The only approach to a definition of unreasonable economic waste is in *Prier,* quoting the passage from Professor Corbin, who says in effect that unreasonable economic waste, like substantial performance, is essentially indefinable. 74 Wn.2d at 30.

It appears, therefore, that adoption of the Restatement terminology has added little to the original rule laid down in *White v. Mitchell, supra.* The juxtaposition of two labels to identify the same amorphous concept is, however, unnecessarily confusing.

The Court of Appeals opinion in the present case reflects this confusion. The Court of Appeals applied a substantial performance analysis to the damages issue raised by Eastlake and an unreasonable economic waste analysis to the issue raised on cross appeal by defendants. The court nowhere suggests that these are in fact merely different aspects of the same rule. On the contrary, the Court of Appeals treats them as quite different rules. In dealing with Eastlake's issue, the Court of Appeals treats substantial performance as a question of fact, implicitly decided by the trial court. In deciding the cross appeal, however, the court determined that the question of unreasonable economic waste is an issue of law. (This conclusion is clearly erroneous; the Court of Appeals cites as authority for its proposition *Prier* and 5 A. Corbin, *supra,* which, as discussed above, unmistakably stand for the proposition that economic waste is a question of fact. This question of fact was resolved by this court in *Prier* only because it was not disputed that repair of the defective ice rink did not constitute unreasonable economic waste.)

The Court of Appeals confusion appears to result in part from a lack of any clear expression by this court of the reasons for the two different measures of damages. The rule recognizes that damages should put the injured party in the

position which he would have enjoyed without the breach. In many cases this will be achieved by awarding the costs of repairing defective construction so as to conform to the contract. Some defects, however, cannot be remedied without great expense and substantial damage to the rest of the structure (for instance, the cracked foundations in *Forrester v. Craddock, supra,* or the nonconforming insulation beneath the concrete floor in the present case). In such cases, the cost of remedying the defect would far exceed the value to the injured party of the improvement. An award of the cost of repairs in such cases would therefore constitute a substantial windfall to the injured party. The cost of repairs should not be awarded if that cost is clearly disproportionate to the value to the injured party of those repairs.

This idea was recognized by Professor McCormick in his treatise on damages:

> In whatever way the issue arises, the generally approved standards for measuring the owner's loss from defects in the work are two: First, in cases where the defect is one that can be repaired or cured *without undue expense,* so as to make the building conform to the agreed plan, then the owner recovers such amount as he has reasonably expended, or will reasonably have to spend, to remedy the defect. Second, if, on the other hand, the defect in material or construction is one that cannot be remedied without an *expenditure for reconstruction disproportionate to the end to be attained,* or without endangering unduly other parts of the building, then the damages will be measured not by the cost of remedying the defect, but by the difference between the value of the building as it is and what it would have been worth if it had been built in conformity with the contract.

(Footnotes omitted. Italics ours.) C. McCormick, *Damages* § 168, at 648–49 (1935).

The crux of the determination of which measure of damages to apply is therefore the proportionality of the cost to the corresponding benefits. This is a factual question which must be resolved, as Professor Corbin points out, according to "prevailing practices and opinions (the mores) of men,

involving their emotions as well as reason and logic". 5 A. Corbin, *Contracts* § 1089, at 492 (1964).

The authors of the Restatement have recently recognized in Restatement (Second) of Contracts (1981) that the concept of unreasonable economic waste is unhelpful in determining damages, and have turned instead to consider the proportionality of the cost of repairs to the value conferred. The second Restatement provides a convenient and effective means of clarifying and regularizing the rules governing this issue.

■ The general rule of damages is stated in Restatement (Second) of Contracts § 347, at 112 (1981):

> Subject to the limitations stated in §§ 350–53, the injured party has a right to damages based on his expectation interest as measured by
> (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus
> (b) any other loss, including incidental or consequential loss, caused by the breach, less
> (c) any cost or other loss that he has avoided by not having to perform.

Comment *a* to this rule explains the rationale for damages under the second Restatement.

> *a. Expectation interest.* Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed.

Further comments to section 347 recognize that in some cases it may be difficult to determine with sufficient certainty the damage to the injured party's expectation interest. Comment *b* states, in part:

> Where the injured party's expected advantage consists largely or exclusively of the realization of profit, it may be possible to express this loss in value in terms of money with some assurance. In other situations, however, this is not possible and compensation for lost value may be precluded by the limitation of certainty. See § 352. In order to facilitate the estimation of loss with sufficient

certainty to award damages, the injured party is some-times given a choice between alternative bases of calcu-lating his loss in value. The most important of these are stated in § 348.

The alternatives set out in Restatement (Second) of Con-tracts § 348, at 119–20, include measures of damages spe-cifically applicable to construction contracts.

(1) If a breach delays the use of property and the loss in value to the injured party is not proved with reason-able certainty, he may recover damages based on the rental value of the property or on interest on the value of the property.

(2) If a breach results in defective or unfinished con-struction and the loss in value to the injured party is not proved with sufficient certainty, he may recover damages based on

(a) the diminution in the market price of the property caused by the breach, or

(b) the reasonable cost of completing performance or of remedying the defects if that cost is not clearly dis-proportionate to the probable loss in value to him.

The comments to section 348 include a helpful discussion of the considerations applicable to a determination of dam-ages for a breach of the construction contract. Comment *c* at page 121 is especially relevant to this case and is here set out in full:

*c. Incomplete or defective performance.* If the contract is one for construction, including repair or similar per-formance affecting the condition of property, and the work is not finished, the injured party will usually find it easier to prove what it would cost to have the work com-pleted by another contractor than to prove the difference between the values to him of the finished and the unfin-ished performance. Since the cost to complete is usually less than the loss in value to him, he is limited by the rule on avoidability to damages based on cost to com-plete. See § 350(1). If he has actually had the work com-pleted, damages will be based on his expenditures if he comes within the rule stated in § 350(2).

Sometimes, especially if the performance is defective as distinguished from incomplete, it may not be possible to prove the loss in value to the injured party with rea-

sonable certainty. In that case he can usually recover damages based on the cost to remedy the defects. Even if this gives him a recovery somewhat in excess of the loss in value to him, it is better that he receive a small windfall than that he be undercompensated by being limited to the resulting diminution in the market price of his property.

Sometimes, however, such a large part of the cost to remedy the defects consists of the cost to undo what has been improperly done that the cost to remedy the defects will be clearly disproportionate to the probable loss in value to the injured party. Damages based on the cost to remedy the defects would then give the injured party a recovery greatly in excess of the loss in value to him and result in a substantial windfall. Such an award will not be made. It is sometimes said that the award would involve "economic waste," but this is a misleading expression since an injured party will not, even if awarded an excessive amount of damages, usually pay to have the defects remedied if to do so will cost him more than the resulting increase in value to him. If an award based on the cost to remedy the defects would clearly be excessive and the injured party does not prove the actual loss in value to him, damages will be based instead on the difference between the market price that the property would have had without the defects and the market price of the property with the defects. This diminution in market price is the least possible loss in value to the injured party, since he could always sell the property on the market even if it had no special value to him.

The Restatement formulation of the rule represents a sensible and workable approach to measuring damages in construction contract cases. It achieves a fair measure of damages while avoiding the potentially confusing concepts of substantial completion and unreasonable economic waste. We therefore adopt Restatement (Second) of Contracts § 348 as the appropriate rule for determining damages in cases such as the present one.

This conclusion requires us to remand the issue of damages to the trial court for reconsideration in light of section 348. The trial court should award defendants the cost of replacing defective items, unless the cost of replacement is

"clearly disproportionate" to the value of the benefit conferred by replacement. Section 348(2)(a) and (b).

Of course, we do not disturb the trial court's award of damages for the loss of rental value, the costs of completing the project, and the costs of remedying various defects. These items of damages are clearly recoverable under section 348. The trial court, therefore, need only apply the "clearly disproportionate" test to the kitchen cabinets and to the nine breaches for which the trial court allowed no damages (listed on pages 35 and 36 of this opinion).

The second issue before us is whether Eastlake's conduct in entering and performing the contract with defendants constituted a violation of the Washington Consumer Protection Act, RCW 19.86.

The Consumer Protection Act declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . ." RCW 19.86.020. Any person injured in his trade or property by a violation of RCW 19.86.020 may bring a private action to recover actual damages sustained, together with the costs of suit, including attorney fees. RCW 19.86.090. In such a suit, the court may in its discretion award additional damages up to three times the actual damages, but not to exceed $1,000. RCW 19.86.090.

In order for a private individual to bring an action under RCW 19.86, the conduct complained of must: (1) be unfair or deceptive; (2) be within the sphere of trade or commerce; and (3) impact the public interest. *Anhold v. Daniels,* 94 Wn.2d 40, 45, 614 P.2d 184 (1980).

There is ample evidence in this case that Eastlake committed numerous unfair and deceptive acts (including misrepresentations and substitutions of unauthorized materials) not only in connection with its contract with defendants, but also (as shown in the offer of proof) in contracts with several other people. *See Keyes v. Bollinger,* 31 Wn. App. 286, 292, 640 P.2d 1077 (1982) (holding that a contractor's business practice of providing estimates to purchasers is an "unfair or deceptive act or practice" when

the contractor is unable to substantially comply with the estimates due to reasons which should be reasonably foreseeable in light of the contractor's knowledge and experience). Indeed, the evidence suggests a continuing program of unfair and deceptive acts. The second criterion is satisfied because Eastlake's contracts to construct houses and other buildings were clearly sales of assets and services, and therefore within the express definition of trade and commerce in RCW 19.86.010.

All that remains, therefore, is to determine whether Eastlake's conduct affected the public interest. Conduct has an impact upon the public interest if:

1. The defendant, by unfair or deceptive acts or practices in the conduct of trade or commerce, has induced the plaintiff to act or refrain from acting;

2. The plaintiff suffers damage brought about by such action or failure to act;

3. The defendant's deceptive acts or practices have the potential for repetition. *Anhold,* 94 Wn.2d at 46.

In the present case, defendants attempted to establish that Eastlake's conduct had an impact upon the public interest. Defendants' efforts to establish the impact upon the public interest were founded upon the offer of proof rejected by the trial court. Defendants offered to produce five witnesses who would testify to untimely, erratic, inadequate, and defective performance of construction contracts by Eastlake, of dozens of violations of building ordinances, and of five other lawsuits pending against Eastlake arising out of allegedly improper performance of construction contracts.

The trial court, however, declined the offer of proof. The Court of Appeals affirmed on the ground that no evidence was offered to establish that an unfair or deceptive act or practice of Eastlake induced defendants to enter the construction contract in June 1977. Therefore, in the Court of Appeals opinion, the first of the three *Anhold* criteria for establishing impact upon the public interest was not satisfied, and accordingly Eastlake's conduct was not a violation

of the act. We disagree, for the reasons stated below.

The purpose of the public interest requirement is to limit actions under the act to those which are the consequence of a generalized course of conduct by a seller, and to exclude actions arising from single transactional disputes. *Anhold* placed the inducement requirement on private suits as a reasonable and logical limitation on the scope of private actions. *See* Comment, *Private Suits Under Washington's Consumer Protection Act: The Public Interest Requirement,* 54 Wash. L. Rev. 795 (1979). An element of "inducement" has a bearing on the establishment of a public interest in that it confines actions to those types of conduct which concern direct or indirect solicitation of the consuming public to act or refrain from acting.

Such solicitation occurred in this case. When a contractor submits a bid or agrees to do a job, he is, in effect, representing that he will perform that job in a workmanlike manner, according to the specifications provided him, in the time stated, and for the price quoted. The purchaser is led to believe that the contractor will substantially comply with these representations. The representations serve to induce potential purchasers in much the same way an advertisement or representation by a salesman would.

> A contractor does not provide "estimates" . . . merely to be helpful to the purchaser, but to influence the purchaser to buy the contractor's product or to rely upon the contractor's services to remedy defects in the product. The purchaser will likely rely upon such "estimates."

*Keyes v. Bollinger,* 31 Wn. App. at 291. As we noted above, a contractor's business practice of providing estimates to purchasers, with which estimates he is unable to substantially comply due to reasons which should be reasonably foreseeable in light of the contractor's knowledge and experience, is an "unfair or deceptive act or practice". As such conduct serves to induce potential purchasers, and as Eastlake appears to have engaged in such conduct, we find that Hess has made the requisite showing of inducement under *Anhold v. Daniels, supra.*

A contrary conclusion would exclude from the operation of the act conduct which clearly should be subject to the express legislative purpose of protecting the public from unfair, deceptive and fraudulent acts or practices. RCW 19.86.920. In particular, the act is designed to protect the public from those who would repeatedly indulge in unfair or deceptive practices, as Hess claims Eastlake has done. In order that this purpose be served, the act is to be construed liberally. RCW 19.86.920. Courts should not readily find an absence of inducement to act in cases where evidence is presented of a pattern of deceptive practices.

We now proceed to consider briefly the remaining two elements of a showing of impact upon the public interest. A plaintiff seeking to bring an action under the act must prove beyond the balance of probabilities that he suffered damages as a result of the action or inaction induced by the defendant's unfair or deceptive acts, and that those unfair or deceptive acts have the potential for repetition. In particular, there must be shown a real and substantial potential for repetition, as opposed to a hypothetical possibility of an isolated unfair or deceptive act's being repeated.

In the present case, the damages suffered by defendants arising out of the construction contract have been thoroughly discussed earlier in this opinion. There can be no doubt that this element is established.

The potential for repetition may also be present here. Defendants' offer of proof might well support a finding that this dispute was not an isolated incident (which would not impact the public interest), but part of a protracted course of conduct by Eastlake. Such a finding would establish the potential for repetition.

Defendants, therefore, offered to present evidence from which the trier of fact could find that Eastlake had indeed violated the Consumer Protection Act. Accordingly, the trial court should allow the defendants to present their evidence and apply the principles set forth in this opinion to determine whether the criteria for an action under the act have been satisfied.

The case is remanded for reconsideration of the issue of damages in the light of Restatement (Second) of Contracts § 348 (1981) and a determination of whether defendants are entitled to an action under the Consumer Protection Act.

WILLIAMS, C.J., and STAFFORD, UTTER, DOLLIVER, and DORE, JJ., concur.

ROSELLINI, J. (concurring in part, dissenting in part)—I concur with Justice Dimmick's concurring/dissenting opinion. However, the majority's analysis of the Consumer Protection Act cause of action deserves further comment.

The purpose of the Consumer Protection Act as set forth by the Legislature in RCW 19.86.920 was to "complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition." At the same time, however, the Legislature made clear it did not wish to prohibit "acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest". In attempting to balance these two concerns, the act essentially copies the approach taken by the federal government in the Federal Trade Commission Act, 15 U.S.C. §§ 41–58 (1970), and further directs us to be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters. RCW 19.86.920.

Enacted in 1914, section 5 of the Federal Trade Commission Act originally declared only unfair methods of competition unlawful. As such, the act was not intended to protect the consumer, but rather to afford more complete relief to competitors under the antitrust laws. With the passage of the Wheeler–Lea Amendment of 1938, adding the phrase "and unfair or deceptive acts or practices in commerce" to section 5's prohibition of unfair methods of competition, the Federal Trade Commission was empowered to proscribe practices affecting consumers as well as

competitors. Section 5 as codified at 15 U.S.C. § 45(a)(1) (1982) now provides: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

The protection afforded under federal trade regulations is primarily for the public at large, rather than the individual consumer. Under 15 U.S.C. § 45(b) (1970), the Federal Trade Commission Act authorized federal action against violators only if it is in the public interest. A common element running through all the types of conduct found by the Commission to be unfair or deceptive is solicitation or public offering. It is the unfair or deceptive practice which has a tendency to mislead the consuming public that is the gist of the Federal Trade Commission Act. *See* Comment, *Toward Effective Consumer Law Enforcement: The Capacity To Deceive Test Applied to Private Actions,* 10 Gonz. L. Rev. 457 (1975); Leaffer & Lipson, *Consumer Actions Against Unfair or Deceptive Acts or Practices: The Private Uses of Federal Trade Commission Jurisprudence,* 48 Geo. Wash. L. Rev. 521 (1980).

Following the purpose section's mandate to be guided by federal law dealing with the same or similar matters, this court in *Lightfoot v. MacDonald,* 86 Wn.2d 331, 544 P.2d 88 (1976) held that the private right of action provisions were designed to enlist private citizens' aid in enforcement of the act, which is desirable only if it serves the public interest and implements the purpose of the act. We concluded that the act did not grant an additional remedy for private wrongs which do not affect the public generally. A breach of a private contract affecting no one but the parties to the contract was not an act or practice affecting the public interest.

> We believe the presence of public interest is demonstrated when the proof establishes that (1) the defendant by unfair or deceptive acts or practices in the conduct of trade or commerce has induced the plaintiff to act or refrain from acting; (2) the plaintiff suffers damage brought about by such action or failure to act; and (3)

the defendant's deceptive acts or practices have the potential for repetition.

*Anhold v. Daniels,* 94 Wn.2d 40, 46, 614 P.2d 184 (1980).

The *Anhold* criteria, that the unfair or deceptive acts or practices have induced the plaintiff to act or refrain from acting, parallels and complements the body of federal law governing unfair and deceptive acts or practices. The purpose of the public interest requirement is to limit actions under the act to those which are the consequence of a generalized course of conduct by a seller, and to exclude actions arising from single transactional disputes. *Anhold* placed the inducement requirement on private suits as a reasonable and logical limitation on the scope of private actions. *See Anhold,* at 47 (Rosellini, J., concurring); Comment, *Private Suits Under Washington's Consumer Protection Act: The Public Interest Requirement,* 54 Wash. L. Rev. 795 (1979). An element of "inducement" has a bearing on the establishment of a public interest, in that it confines the actions to those areas of conduct which concern solicitation of the consuming public to act or refrain from acting.

In the instant action, Hess attempted to establish the requisite public interest by an offer of evidence of untimely, erratic, inadequate and defective performance of construction contracts by Eastlake, of dozens of violations of building ordinances, and of five other lawsuits pending against Eastlake arising out of allegedly improper performance of construction contracts. While this evidence tends to establish that other members of the consuming public have been damaged by improper performance of Eastlake contracts, it does not establish that unfair or deceptive misrepresentations induced the parties of those contracts to act or refrain from acting. Mere proof that a contractor is a second–rate builder who does not live up to industry standards does not tend to establish unfair or deceptive solicitation of the consuming public. There must be unfair or deceptive acts or practices which induce the consuming public to act or refrain from acting in order for the Consumer Protection Act to come into play. Thus, in *Keyes v. Bollinger,* 31 Wn.

App. 286, 292, 640 P.2d 1077 (1982), the court held that a contractor engages in an unfair or deceptive act by estimating or representing completion dates to purchasers, representations with which he is unable to substantially comply due to reasons which should be reasonably foreseeable in light of the contractor's knowledge and experience.

Here, it appears that Eastlake contracted to perform according to specifications and represented that performance would be completed in a workmanlike manner. Where these representations lack substantial compliance for reasons which should have been reasonably foreseeable in the light of the contractor's knowledge and experience, the contractor engages in an unfair or deceptive act which induced the purchaser to enter into the contract.

*Keyes* stands for the further proposition that where the evidence shows that the contractor engages in such acts as a matter of business practice, then such conduct affects the public interest. *Keyes,* at 292–93. This is in the nature of establishing that the unfair or deceptive acts have a potential for repetition.

In order to meet the *Anhold* criteria, the offer of proof must further establish that Eastlake made similar representations to the consuming public which lacked substantial compliance for reasons which should have been reasonably foreseeable. Only then would such evidence be relevant to establishing a business practice that has the potential for repetition in unfairly or deceptively inducing the consuming public to act or refrain from acting.

Accepting the foregoing as the interpretation the majority has given the Consumer Protection Act, I concur.

BRACHTENBACH, J., concurs with ROSELLINI, J.

DIMMICK, J. (concurring in part, dissenting in part)—I concur in the majority's adoption of Restatement (Second) of Contracts § 348 (1981) to determine the proper measure of damages for breach of a construction contract. I further agree that defendant's Consumer Protection Act cause of

action is appropriately remanded. I disagree, however, that remand is needed on the issue of damages for the construction defects at issue here.

It appears to me that the majority opinion gives no clear direction to the trial court. Section 348 appears to give the injured party alternative remedies, assuming defective or incomplete construction and inability to prove loss of value with sufficient certainty. As I read section 348, the trial court may award the cost of remedying all the defects if that cost is not disproportionate to the value the repairs will actually confer on the injured party. *See* Restatement (Second) of Contracts § 348, comment *c* (1981). But in some cases such an award would produce a large windfall because the injured party would not find it cost beneficial to make the repairs. Then the trial court must award only the difference in market price with and without the defects. In theory the rule is clear. In practice, where the defects range from trivial to extensive, does the trial court evaluate each defect for the cost benefit of its repair to the injured party? Or should the trial court consider the repair cost of *all* defects and then evaluate the proportionality of that total cost to the probable value of repair?

As written, section 348 suggests that the cost of repairing all defects should be compared to the value conferred from all repairs. The majority, however, implies that the trial court should evaluate each defect separately. This is clearly the fairest approach, one that has been approved in several jurisdictions. *See, e.g., Summit Constr. Co. v. Yeager Garden Acres, Inc.,* 28 Colo. App. 110, 470 P.2d 870 (1970); *Gerodetti v. Broadacres, Inc.,* 363 So. 2d 265 (Miss. 1978). But what does the trial court do with defects that are disproportionately costly to correct? Does the trial court award additional damages based on the resulting reduction in market price? If so, the market price appraisal must take into account the increase in value, if any, that will result from the correction of defects for which damages have already been awarded. One must wonder if a market price evaluation attempting to account for all these factors would

58

be more than speculation.

In this case, I would affirm the trial court's award of damages. If my understanding of the procedure that the majority wishes the trial court to follow is correct, I think the trial court has already complied. Damages were awarded for defects already corrected by Hess and for repairs clearly of significant value to Hess in relation to repair costs. No damages were allowed for only those defects that the trial court found would not cause substantial loss. For these defects, the cost of repair would clearly be considerable (*e.g.,* replacing insulation under concrete floors) and resulting benefit minimal. The disproportionality test is therefore satisfied.

Further, the trial court rejected testimony regarding the value of the condominiums as constructed. Apparently no other testimony on market price was offered. Thus, any further award based on a loss of market price due to irremediable defects is not possible. Under these circumstances, I find remand for reconsidering the construction defect damages to be useless.