IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MYX BOM, INC., a Washington corporation, | No. 87707-1-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| CSKK CORPORATION, a Washington corporation; LJK ENTERPRISES, INC., a Washington corporation; and CHU AH KIM and JUHNEE YIM, and the marital community composed thereof, | |
| Appellants. | |

DíAZ, J. — Chu Ah Kim and Juhnee Yim (collectively Kim) sold Myx Bom, Inc., a teriyaki restaurant, pursuant to a purchase and sale agreement (PSA) which included a noncompete covenant. A superior court granted summary judgment in Myx Bom's favor on both liability and damages (order), finding that Kim breached the covenant and that a thrice-revised addendum to the PSA fixed the amount of damages for such breaches. Kim here challenges both decisions.

We conclude that there is no genuine issue of material fact that Kim breached the noncompete covenant by opening a teriyaki restaurant within five

miles of the restaurant it had sold, using similar menu displays, the same vendors, and the same chef. But we hold that a fact finder must decide the amount of money damages to which Myx Bom may be entitled because of the breach. Thus, we affirm the order in part, reverse the order in part, and remand this matter to the court for further proceedings.

## I.    BACKGROUND

On February 5, 2021, buyer Dong Il Yoon entered into a PSA with seller LJK Enterprises, Inc., by and through its owner Chu Kim, for the sale of Ichi Teriyaki, a restaurant located in Lynnwood.[1] The total purchase price was $800,000 plus the cost of inventory. The PSA contained the following noncompete provision:

> COVENANT NOT TO COMPETE. Seller, and all partners, members, shareholders, officers and directors of Seller, agree that for a period of 60 months following Closing, neither Seller nor its partners, members, shareholders, officers or directors will participate in the ownership or operation of any business that *competes directly* with the business sold to Buyer that is located within a *radius* of 5 miles of any business location sold to Buyer under this Agreement. If Seller breaches this covenant, Buyer will be entitled to obtain an injunction to prevent the competitive activity, as well as to recover any money damages, attorney fees, and costs to which Buyer may be entitled.

(Emphasis added.)

On March 18, 2021, the parties executed an "addendum/amendment" to the PSA in which they agreed to change the name of the buyer to Myx Bom Inc., with "[t]he purchase price to be allocated as following [sic.]:"

| | |
|---|---|
| Equipment: | $10,000 |
| Goodwill: | $650,000 |

---

[1] LJK Enterprises Inc. was administratively dissolved in June 2021.

Non-compete:          $140,000

On April 19, 2021, two days before Myx Bom took possession of Ichi Teriyaki, the parties executed an "Allocation Addendum" "for the purpose of allocat[ing] the purchase price."  In March 2022, Yoon's accountant had noticed that the valuations in the allocation addendum were left blank and had asked Yoon to provide the numbers so he could prepare Yoon's tax return.  Yoon acknowledged that, "[i]n the flurry of documents," he did not recall the March 2021 addendum/amendment containing this information.  On September 14, 2022, the parties re-signed the allocation addendum with the same numbers filled in.

Meanwhile, in May 2022, Kim and former Ichi Teriyaki chef Taeyoung Kim formed CSKK Corporation and purchased PNW Teriyaki, a restaurant in Everett.  The radial distance between PNW Teriyaki and Ichi Teriyaki is 4.18 miles.  After CSKK took over, PNW Teriyaki modified its menu, menu displays—becoming similar to Ichi Teriyaki's—and contracted with the same vendors.

In October 2022, Yoon learned that Kim was operating PNW Teriyaki.  In February 2023, Myx Bom asked Kim to cease and desist from violating the noncompete covenant by operating a teriyaki restaurant within a five-mile radius of Ichi Teriyaki.  Kim did not do so.

In May 2023, Myx Bom filed a complaint against Kim and CSKK for damages and injunctive relief based on breach of the noncompete covenant.  Kim immediately divested his interest in PNW Teriyaki by transferring his shares in CSKK Corp. to Taeyoung Kim.[2]

---

[2] CSKK was dismissed from the lawsuit in September 2023.

Myx Bom moved for summary judgment, which the court granted. In its order, the court held that no issues of material fact exist that Kim breached the noncompete clause; that the parties agreed the noncompete clause is valued at $140,000; that Myx Bom lost the entire value of the benefit of its bargain because the competing restaurant is still operating within a five-mile radius of Ichi Teriyaki; that the damages are liquidated; and that Myx Bom is entitled to prejudgment interest from the date of breach. The court entered judgment, awarding Myx Bom over $220,000.

Kim timely appeals.

## II.   ANALYSIS

### A.   Standard of Review

We review summary judgment orders de novo. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). Summary judgment is appropriate when the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).

Summary judgment is subject to a burden-shifting scheme. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). The party moving for summary judgment bears the initial burden of demonstrating that there is no disputed issue of material fact. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). If the moving party satisfies its burden, the burden then shifts to the nonmoving party to present evidence that an issue of material fact remains. Id. at 225. "A material fact is one on which the litigation's outcome depends in

whole or in part." *TT Props., LLC v. City of Tacoma*, 192 Wn. App. 238, 245, 366 P.3d 465 (2016). Summary judgment is also proper if, after reviewing all the evidence, a reasonable person could reach only one conclusion. *Kelsey Lane Homeowners Ass'n v. Kelsey Lane Co., Inc.*, 125 Wn. App. 227, 232, 103 P.3d 1256 (2005).

B.     Remedy for Breach of the Noncompete Clause

The parties devote most of their briefing to the question of damages, namely, whether the parties contractually agreed to fix money damages for any breach of the noncompete clause at $140,000. We conclude that the contracts in question, as a matter of law, did not include such a liquidated damage clause and, when properly so understood, there are several genuine issues of material fact as to the amount of money damages to which Myx Bom may be entitled because of the breach.

1.  Legal Principles

a.  Contract Interpretation

"Washington courts 'are loath[ ] to interfere with the rights of parties to contract as they please between themselves.'" *Salewski v. Pilchuck Veterinary Hosp., Inc., P.S.*, 189 Wn. App. 898, 908, 359 P.3d 884 (2015) (alteration in original) (quoting *Mgmt., Inc. v. Schassberger*, 39 Wn.2d 321, 326, 235 P.2d 293 (1951)). The goal of contract interpretation is to ascertain the parties' mutual intent. *U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565, 569, 919 P.2d 594 (1996). We "determine the parties' intent at the time they executed the contract rather than 'the interpretations the parties are advocating at the time of the litigation.'" *Radliff*

5

*v. Schmidt*, 27 Wn. App. 2d 205, 210, 532 P.3d 622 (2023) (quoting *Int'l Marine Underwriters v. ABCD Marine, LLC*, 179 Wn.2d 274, 282, 313 P.3d 395 (2013) (plurality opinion)).

We give "undefined terms their plain, ordinary, and popular meaning." *Nishikawa v. U.S. Eagle High, LLC*, 138 Wn. App. 841, 849, 158 P.3d 1265 (2007). Further, we impute to the parties an intention that corresponds with the reasonable meaning of the words used in their contract. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). "If only one reasonable meaning can be ascribed to the agreement when viewed in context, that meaning necessarily reflects the parties' intent; if two or more meanings are reasonable, a question of fact is presented." *Interstate Prod. Credit Ass'n v. MacHugh*, 90 Wn. App. 650, 654, 953 P.2d 812 (1998). When reliance on extrinsic evidence is unnecessary, contract interpretation is a question of law. *Wash. State Major League Baseball Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Const. Co.*, 176 Wn.2d 502, 517, 296 P.3d 821 (2013).

b. Measure of Damages

To prevail on a breach of contract claim, the plaintiff must establish that the contract imposed a duty, that the defendant breached that duty, and that the breach proximately caused damage to the plaintiff. *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995).

The applicable measure of damages in a contract action is the "benefit of the bargain rule." *Reichl v. State Farm Mut. Auto. Ins. Co.*, 75 Wn. App. 452, 455, 880 P.2d 558 (1994). "Contract damages are ordinarily based on the injured

6

party's expectation interest and are intended to give the injured party the benefit of its bargain." *Panorama Vill. Homeowners Ass'n v. Golden Rule Roofing, Inc.*, 102 Wn. App. 422, 427, 10 P.3d 417 (2000). A party injured by breach of contract "is entitled (1) to recovery of all damages that accrue naturally from the breach, and (2) to be put into as good a pecuniary position as he would have had if the contract had been performed." *Eastlake Constr. Co., Inc. v. Hess*, 102 Wn.2d 30, 39, 686 P.2d 465 (1984)).

"A 'liquidated damages' clause in a contract specifies a sum of money agreed upon in advance by the parties to serve as a reasonable forecast of just compensation for the predicted harm caused by breach." 25 DAVID K. DEWOLF ET AL., WASHINGTON PRACTICE: CONTRACT LAW AND PRACTICE § 14:13 (3d ed. 2014). The party asserting a right to liquidated damages is not required to prove actual damages. *Wallace Real Estate Investment Inc. v. Groves*, 124 Wn.2d 881, 892, 881 P.2d 1010 (1994). A liquidated damages clause is enforceable "if the sums involved do not amount to a penalty or are otherwise unlawful." *Watson v. Ingram*, 124 Wn.2d 845, 850, 881 P.2d 247 (1994). "The main inquiry is 'whether the specified liquidated damages were reasonable at the time of contract formation.'" *Salewski*, 189 Wn. App. at 909 (quoting *Watson*, 124 Wn.2d at 853). An award of prejudgment interest is available if the damages are liquidated. *Scoccolo Const., Inc. v. City of Renton*, 158 Wn.2d 506, 519, 145 P.3d 371 (2006).

2. <u>Allocation Addendum</u>

The various iterations of the addendum state that the parties agreed to "allocate[]" $140,000 of the $800,000 purchase price to the noncompete covenant

7

and that the addendum was signed "for the purpose of allocation purchase price [sic.]."

Myx Bom argues that this language unambiguously entitles it to damages equal to what it paid for Kim's promise not to compete, so the trial court properly awarded $140,000 for complete loss of the benefit of its bargain plus prejudgment interest on these liquidated damages. Kim contends in part that the allocation addendum did not convert the noncompete clause into a liquidated damages provision, so Myx Bom is required to prove actual damages and proximate cause. We agree with Kim.

"When interpreting contracts, we attempt 'to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties,' imputing an intention corresponding to the reasonable meaning of the words used." *In re Estate of Petelle*, 195 Wn.2d 661, 665, 462 P.3d 848 (2020) (quoting *Hearst Commc'ns, Inc.*, 154 Wn.2d at 503). Here, neither the PSA nor the allocation addendums make any mention of damages for breach of the noncompete clause at all, let alone agree to fix, set, or specify damages in advance at $140,000, thereby converting the noncompete clause or any other provision into a liquidated damages agreement.

If we were to stretch the plain meaning of the addendums to unearth a liquidated damages clause, we would be "[a]dding terms to the contract," which "would amount to writing a new contract." *In re Marriage of Mudgett*, 41 Wn. App. 337, 341, 704 P.2d 169 (1985). We may not do so.

The parties could have specified that, in the event of a breach, Myx Bom is

8

entitled to the amount set out in the allocation addendums. They did not. Instead, importantly, the noncompete covenant in the PSA goes on to state that Myx Bom "will be entitled to obtain an injunction to prevent the competitive activity, as well as to recover *any money damages*, attorney fees, and costs to which [Myx Bom] may be entitled." (Emphasis added.) Myx Bom's interpretation of the allocation provision would render the remedy of "recover[ing] any money damages" superfluous because the former would set the latter as the amount of damages regardless of the nature or scope of the breach. *See Fitness Int'l, LLC v. Nat'l Retail Props, LP*, 25 Wn. App. 2d 606, 613, 524 P.3d 1057 (2023) (holding that contracts should be construed as a whole to effectuate all provisions if reasonably possible).

It is also telling that nowhere does Myx Bom explain either why the addendum's purported liquidated damages provision "do[es] not amount to a penalty or [is] otherwise unlawful," or how "the specified liquidated damages were reasonable at the time of contract formation." *Watson*, 124 Wn.2d at 850, 853. We decline to do its work for them.

Moreover, even if we were to read such a clause into the contracts or create some kind of ambiguity, the parties agreed that the allocation addendums did not alter the terms of the noncompete clause, and the only evidence in the record is that the addendum was created for tax purposes, which is the well-settled purpose of such an agreement.[3] To this extent, Myx Bom did not carry its burden on

---

[3] Purchase price allocation agreements are "driven by the well-settled principle that a trade or business is comprised of multiple assets or categories of assets, each

summary judgment even under a more generous interpretation of the contract—which we do not adopt. *See Young*, 112 Wn.2d at 225.

We conclude, as a matter of law, that the trial court erred in interpreting the contract as it did when awarding $140,000 as the full benefit of the bargain, plus prejudgment interest for liquidated damages. *Huber, Hunt & Nichols-Kiewit Const. Co.*, 176 Wn.2d at 517.

Finally, with this proper understanding of the contractual provision at issue, we further hold that Kim has demonstrated the existence of numerous questions of material fact as to the amount of "money damages" Myx Bom may be entitled to for the breach under the PSA. *See* Br. of Appellant at 29-30; Reply Br. of Appellant at 20-21.[4] These include contested questions of proximate cause (i.e., those "damages that accrue naturally from the breach") and the economic loss suffered as a result (i.e., what it will take to put Myx Bom "into as good a pecuniary position as he would have had if the contract had been performed."). *Hess*, 102 Wn.2d at 39.

In short, we reverse the summary judgment order as to the amount of money damages Myx Bom may be entitled to as a result of the breach and remand this matter for trial on this question.

C.     Breach of Noncompete Clause

In pertinent part, the noncompete clause required Kim not to participate in

---

of which gives rise to separate tax determinations."   Jay A. Soled, Leonard Goodman, Alan Kornstein, & Daniela C. Gallagher, Purchase Price Allocations: Tax and Contractual Assets, 78 TAX LAW. 317, 317 (2025).

[4] Because Myx Bom will be required to present evidence of damages caused by the breach at trial, we do not review the evidence here.

the "ownership or operations of any business" located within a five-mile radius that "competes directly" with Ichi Teriyaki for a period of 60 months following closing.

Kim argues that the trial court erred in concluding he violated the noncompete clause because Myx Bom failed to present evidence that PNW Teriyaki "directly competed" with Ichi Teriyaki. This is so, he contends, because Myx Bom failed to prove that PNW Teriyaki was a "threat" to Ichi Teriyaki. He points out that PNW Teriyaki was located in a different city over four miles away, PNW Teriyaki existed before he purchased it, and there were other teriyaki restaurants in the area. He also notes that there is no evidence that PNW Teriyaki marketed to bring in new business or that it started using Ichi Teriyaki's sauce recipe or stole its employees. Without such proof, Kim asserts, the clause would unreasonably prohibit him from operating any business within five miles.

The term "directly compete" is not defined in the contract. "[C]ompetition" is defined as the "struggle for commercial advantage; the effort or action of two or more commercial interests to obtain the same business from third parties." BLACK'S LAW DICTIONARY 357 (12th ed. 2024).

We conclude, as a matter of law, that the noncompete covenant is subject to only one reasonable interpretation: Kim agreed not to open or operate "any" restaurant within five miles of Ichi Teriyaki, which would struggle for or seek to obtain the same customers. *Huber, Hunt & Nichols-Kiewit Const. Co.*, 176 Wn.2d at 517.

And we conclude that that summary judgment was properly granted on the facts adduced in this case. There is no dispute that PNW Teriyaki is located within

11

five miles of Ichi Teriyaki or that both restaurants sell the same type of cuisine, with the word "Teriyaki" in both their businesses' names. Further, Kim admitted that he changed the menu displays, vendors, and "other things" when he took ownership of PNW Teriyaki, which he does not (in discovery or in his briefing) contest rendered them similar to Ichi Teriyaki's.[5] And Ichi's Teriyaki's former chef Taeyoung Kim helped Kim purchase the offending restaurant. After reviewing all the evidence, a reasonable person could reach only one conclusion: PNW Teriyaki was directly competing with Ichi Teriyaki, in violation of the covenant. *Kelsey Lane Homeowners Ass'n*, 125 Wn. App. at 232.

There is nothing in the contract that requires the competing restaurant to be a true economic "threat" or that excuses a restaurant if it is in a different municipality, if the market is saturated with teriyaki restaurants, or if Kim refrains from marketing to certain potential customers or promises not to use Ichi Teriyaki's sauce recipe. The facts Kim adduces, thus, are immaterial to plain terms of the contract because "the litigation's outcome" does not "depend[] in whole or in part" on them. *TT Props.*, 192 Wn. App. at 245. In short, they do not prevent summary judgment.

### III. CONCLUSION

We reverse and remand for trial on the damages for breach of the

---

[5] In contrast, in their briefing and in discovery, Kim contested only that the menu and recipe for the proprietary sauce were not the "same" as Ichi Teriyaki's after he joined PNW Teriyaki. Given the other uncontested facts in this record reviewed above, whether or not the menu or recipes are identical is not material to the dispute.

noncompete covenant and otherwise affirm.[6]

Díaz, J.

WE CONCUR:

Chung, J.

---

[6] On remand, after the matter is fully adjudicated, the trial court shall determine the proper amount of attorney fees to be awarded. RAP 18.1(i). Any decision at this time would be premature, even if one party had prevailed on each issue on appeal, which did not occur here. *Bogen v. City of Bremerton*, 18 Wn. App. 2d 676, 685, 493 P.3d 774 (2021).